# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ANA VIZCARRONDO-GONZALEZ,<br><br>Plaintiff,<br><br>v.<br><br>SONNY PERDUE, SECRETARY UNITED STATES DEPARTMENT OF AGRICULTURE (USDA), **et al.**,<br><br>Defendants. | CIVIL NO. 16-2461 (PAD) |

## OPINION AND ORDER

Delgado-Hernández, District Judge.

Plaintiff Ana Vizcarrondo-González initiated this action against the U.S. Department of Agriculture and the Secretary of Agriculture, Thomas Vilsack (collectively "USDA") and Eliud Rivera, a co-worker, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., the U.S. Constitution and Puerto Rico law, including Puerto Rico's general tort statute, Article 1802 of the Civil Code, P.R. Laws Ann. tit. 31 § 5141.[1]  Initially, the court dismissed all claims against Rivera except for the Article 1802 claim (Docket No. 20).  Further, it issued a show cause order as to why, other than the tort claim, the state and constitutional claims should not be dismissed as to the USDA (Docket No. 22).  Plaintiff responded asking that those claims be dismissed (Docket No. 27). In consequence, the claims were dismissed (Docket No. 28).  As a result, three claims remain: discriminatory and retaliatory hostile work environment claims under Title VII and the tort claim in connection with Puerto Rico law.

---

[1] The other local provisions invoked were Law No. 17 of April 22, 1988, P.R. Laws Ann. tit. 29, § 155; Law No. 69 of July 6, 1985, P.R. Laws Ann. tit. 29, § 1321; Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29, § 194, and Sections 1, 8 and 16 of Article II of Puerto Rico's Constitution, P.R. Laws Ann, tit. 1 (Docket No. 1, p. 2, ¶ 7).

Defendants answered the complaint denying liability (Docket Nos. 18 and 23). Following discovery, the USDA filed a motion for summary judgment (Docket No. 36), which Rivera joined (Docket No. 39). Plaintiff opposed the motion (Docket No. 44). The USDA replied (Docket No. 50), and plaintiff sur-replied (Docket No. 56). On March 31, 2019, the court granted in part and denied in part the USDA's motion for summary judgment (Docket No. 61). As explained below, whereas the Title VII claims must be dismissed, analysis of the tort claim requires further briefing in light of the Federal Tort Claims Act ("FTCA").

## I.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is "genuine" if it could be resolved in favor of either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). It is "material" if it potentially affects the outcome of the case in light of applicable law. Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

All reasonable factual inferences must be drawn in favor of the party against whom summary judgment is sought. See, Shafmaster v. U.S., 707 F.3d. 130, 135 (1st Cir. 2013)(so noting). To resist summary judgment, however, the nonmovant must do more than show some metaphysical doubt as to a material fact. See, Matsushita Elec. Inds. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(articulating proposition). Conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative, however, will not suffice to ward off a properly supported summary judgment motion. See, Nieves-Romero v. U.S., 715 F.3d 375, 378 (1st Cir. 2013)(applying principle).

Based on these parameters, careful record review shows absence of genuine factual dispute as to the facts identified in the section that follows. The facts are set against the background of the legal issues to be addressed, namely: exhaustion of prescribed administrative remedies; equitable estoppel; sufficiency of the employer's response to plaintiff's allegations against Rivera; the merit of plaintiff's claims of gender-based and retaliatory hostile work environment; and the tort claim under Article 1802 of the Civil Code and the FTCA.

## II.      FINDINGS OF FACT[2]

### a.  Plaintiff-Codefendant Rivera

At the time of relevant events, plaintiff was a G-7 Plant Protection and Quarantine Officer ("PPQO") with the Animal and Plant Health Inspection Service ("APHIS") of the USDA assigned to the San Juan International Airport in Puerto Rico (Docket No. 1). PPQOs serve as a liaison for the APHIS on operational activities and work with state and federal officials and others interested in activities affected by plant quarantine programs. See, Docket No. 37, "Statement of Material Uncontested Facts in Support of Motion for Summary Judgment" ("SUMF"), ¶ 4; Docket No. 44-1, "Plaintiff Vizcarrondo's Response to the Defendant Sonny Perdue, Secretary of the U.S. Department of Agriculture's Statement of Uncontested Material Facts Pursuant to Local Rule 56(c), (e)" ("OSUMF"), p. 1. They perform specialized duties related to biosecurity, minimizing the risk of biological and economic damage caused by exotic, non-native plant and animal organisms to agriculture, natural resources and U.S. trade initiatives involving overall plant health activities. Id.

---

[2] Except otherwise noted, the facts included in this section are drawn from the parties' Local Rule 56 submissions (Docket Nos. 16-1, 18-1, 24-1, 38, 47). This rule is designed to "relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute." CMI Capital Market Investment, LLC. v. González-Toro, 520 F.3d 58, 62 (1st Cir. 2008).

Rivera was a G-5 Plant Protection and Quarantine Technician ("PPQT") with the APHIS assigned to the San Juan International Airport. See, SUMF (Docket No. 37), ¶ 5; OSUMF (Docket No. 44-1), p. 1. A PPQT works under the general and technical supervision of a PPQO. See, SUMF (Docket No. 37), ¶ 5; OSUMF (Docket No. 44-1), p. 1. Thus, Rivera was not plaintiff's supervisor. Her position was of a higher hierarchical standing than Rivera's position within the Plant Protection and Quarantine Program. Id.

**b. Reporting of Incidents**

On May 24, 2014, plaintiff met with her immediate supervisor, José Sánchez, to report that Rivera had sexually harassed her the day before, and that he had behaved inappropriately on previous occasions. See, SUMF (Docket No. 37) ¶ 6; OSUMF (Docket No. 44-1), p. 1.[3] At Sánchez's request, the same day plaintiff submitted a letter detailing the alleged incident with Rivera. See, SUMF (Docket No. 37) ¶¶ 7-8; OSUMF (Docket No. 44-1), p. 1. To this end, the letter expressed that, while plaintiff was in the pre-departure operations office, Rivera walked in and stated "Ave Maria, each time that I eat an ice cream cone and lick it I think of Ana." See, SUMF (Docket No. 37) ¶¶ 8-9; OSUMF (Docket No. 44-1), p. 1.[4] After making this comment, Rivera licked the cone, making a suggestive motion with his tongue. See, SUMF (Docket No. 37) ¶ 9; OSUMF (Docket No. 44-1), p. 1. The letter identified another employee, PPQT Eduardo Traverzo, as a witness. See, SUMF (Docket No. 37) ¶ 9; OSUMF (Docket No. 44-1), p. 1.

---

[3] Plaintiff admits this statement. See, OSUMF (Docket No. 44-1), p.1. Yet, in her additional statement of uncontested material facts, she states that she "specifically grieved about sexual harassment to her immediate supervisor José Sánchez as to the fact that she felt sexually harassed by Eliud Rivera" on May 24, 2014. See, "Plaintiff's Statement of Material Facts Which Preclude Entry of Summary Judgment in Defendants' Favor Pursuant to Local Rule 56(c)" ("ASUMF") (Docket No. 44-2) ¶ 1. The only difference between the USDA's statement and plaintiff's additional statement is that the latter states plaintiff "grieved" to her supervisor, while the former states that plaintiff "reported" the event. The distinction is immaterial, for at the end of the day plaintiff provided some information about a coworker to her supervisor.

[4] Roughly translated, "Ave María" corresponds to "Hail Mary."

In addition, the letter referred to other incidents involving Rivera before May 24, 2014. See, SUMF (Docket No. 37) ¶ 9; OSUMF (Docket No. 44-1), p. 1. It expressed that on a previous occasion Rivera had asked plaintiff if he could buy her ice cream, which she declined. See, SUMF (Docket No. 37) ¶ 10, OSUMF (Docket No. 44-1), p. 1. On another occasion, Rivera stared at plaintiff through a glass window and licked an ice cream cone in a "sexually suggestive" manner. Id. Plaintiff felt disgusted by Rivera's actions and believed his conduct was improper but did not report these events to her supervisor when they occurred. See, SUMF (Docket No. 37) ¶ 10; OSUMF (Docket No. 44-1), p. 1.[5] Upon learning of the incidents, Sánchez expressed concern, stating that he would "take charge of [plaintiff's] case…forward [plaintiff's] case… and take all actions." See, SUMF (Docket No. 37) ¶¶ 7-8; OSUMF (Docket No. 44-1), p. 1.

### c.   USDA's Response

On May 27, 2014, Sánchez notified Rivera of plaintiff's allegations and that they would be investigated. See, SUMF (Docket No. 37) ¶ 13; OSUMF (Docket No. 44-1), p. 1. He advised Rivera that the latter should refrain from inappropriate conduct. See, SUMF (Docket No. 37) ¶ 13; Docket No. 37-7, p. 1.[6] Sánchez informed Eduardo Traverzo that plaintiff had named him as a witness to the incident and requested a written statement, which Traverzo submitted. See, SUMF (Docket No. 37) ¶ 14; OSUMF (Docket No. 44-1), p.1. Also, Sánchez sent an email to Eunice Everett, Employee Relation Specialist of the Human Resources Division of APHIS, who provided

---

[5] Plaintiff denies this statement, claiming that she "specifically grieved about sexual harassment" to Sánchez about "the fact that she felt sexually harassed" by Rivera. See, OSUMF (Docket No. 44-1), p. 2 (responding to SUMF (Docket No. 37) ¶ 11). She supports her contention by pointing to her May 24, 2014 letter to Sánchez (Docket No. 37-5) and Sánchez's May 27, 2014 email reporting the incident to Norma Rosario, Port Director for APHIS (Docket No. 37-6). The evidence does not dispute USDA's assertion that plaintiff failed to report the incident to a supervisor immediately after it occurred.

[6] Plaintiff denies this statement, arguing that the record does not support the statement that Sánchez warned Rivera to refrain from inappropriate conduct. See, OSUMF (Docket No. 44-1), p. 2. But the statement refers to and is supported by Sánchez's email to Rivera. See, Docket No. 37-7, p. 1.

additional guidance on how Sánchez should address plaintiff's allegations against Rivera. See, SUMF (Docket No. 37) ¶ 15-16.[7] Everett told Sánchez that Rivera should be moved from his position while the investigation was conducted, as plaintiff had stated she was not comfortable working with him. See, SUMF (Docket No. 37) ¶ 16; OSUMF (Docket No. 44-1), p. 1.

On May 28, 2014, PPQ Port Director Rosario notified Rivera by letter that he was being placed on paid excused absence until further notice pending an investigation into the allegations against him. See, SUMF (Docket No. 37) ¶ 17; OSUMF (Docket No. 44-1), p. 1. She instructed Rivera not to report to work or access the USDA building, or any agency computer systems or programs, and to refrain from contacting any Agency employees, warning him that failure to subscribe to these orders could result in disciplinary action against him. See, SUMF (Docket No. 37) ¶ 17; OSUMF (Docket No. 44-1), p. 1. Rivera complied, surrendering his employment IDs, parking card, badge, and keys. See, SUMF (Docket No. 37) ¶ 19; OSUMF (Docket No. 44-1), p. 1. He was out for over three months, from May 27, 2014 to September 9, 2014 (Docket No. 50-1, p. 4, ¶ 4).

### d. Administrative Investigation

On May 28, 2014, Sánchez submitted a request for an investigation into plaintiff's allegations with the Administrative Investigation and Compliance Branch ("AICB") of APHIS's Human Resources Division. See, SUMF (Docket No. 37) ¶ 18; OSUMF (Docket No. 44-1), p. 1. In turn, the AICB assigned the case to Personnel Misconduct Investigator Anthony A. Gabaldon. See, SUMF (Docket No. 37) ¶ 24; OSUMF (Docket No. 44-1), p.1. Gabaldon interviewed

---

[7] Plaintiff qualifies this statement, stating there is no evidence on the record to suggest that Everett was part of APHIS's Human Resources Division. However, she later admits that Everett was part of that Division. See, SUMF (Docket No. 37) ¶ 43, OSUMF (Docket No. 44-1), p.1.

plaintiff, Rivera, and Traverzo. See, SUMF (Docket No. 37) ¶ 24; OSUMF (Docket No. 44-1), p. 1.

During plaintiff's interview, Gabaldon identified himself as a Personnel Misconduct Investigator for AICB, stating that he had been assigned to investigate her sexual harassment claim against Rivera. See, SUMF (Docket No. 37) ¶ 32, OSUMF (Docket No. 44-1), p.1. He explained the investigative process and his role, informing plaintiff that he would be taking a sworn statement as part of the process. See, SUMF (Docket No. 37) ¶ 32, OSUMF (Docket No. 44-1), p.1. He did not indicate he was an Equal Employment Opportunity (EEO) investigator conducting an EEO investigation on plaintiff's claim. See, SUMF (Docket No. 37) ¶ 33.[8] Nor did plaintiff refer to the EEO process or express a belief that Gabaldon was conducting an EEO investigation. See, SUMF (Docket No. 37) ¶ 34.[9] Gabaldon was not authorized to conduct EEO investigations, which are carried out by the Office of Civil Rights, Diversity and Inclusion ("OCRDI"). See, SUMF (Docket No. 37) ¶ 34.[10]

---

[8] Plaintiff denies this statement, citing to her deposition testimony that Gabaldon "specifically informed and advised [her] that he was assigned to investigate her grievance claiming sexual harassment." See, OSUMF (Docket No. 44-1), p. 3. Further, she states she was told by Sánchez that he would "tak[e] care" of her complaint against Rivera and was going to "forward [plaintiff's] case and take all actions." Id. Plaintiff's denial is non-responsive, and contrary to the evidence respecting the fact asserted. See, Plaintiff's "Statement" (Docket No. 32-1), p. 1 (acknowledging that Gabaldon identified himself as "Personnel Misconduct Investigator for the Administrative Investigations and Compliance Branch (AICB), Human Resources Division (HRD), Animal and Plant Health Inspector Service (APHIS);" Plaintiff's Deposition (Docket No. 37-34), p. 45 (Q. "With regards to Mr. Anthony Gabaldon, did Mr. Anthony Gabaldon ever said that he was an EEO investigator?" A. "No, he said that he was from the Investigation Office, the one that send [sic] in the document"); and Gabaldon's Declaration (Docket No. 32-17), p. 2 (¶ 5( asserting that at no time he mentioned to plaintiff or other individuals that he was and EEO investigator conducting an EEO investigation on plaintiff's asserted claims against Rivera), ¶ 6 (pointing out that at no time during the interview or throughout the investigation plaintiff made reference to EEO or a belief that Gabaldon was conducting and EEO investigation), and ¶ 7 (stating that Gabaldon is not authorized to conduct EEO investigations, which are conducted by APHIS's Office of Civil Rights, Diversity and Inclusion ("OCRDI").

[9] Plaintiff denies this statement, citing to her deposition testimony that Gabaldon "specifically informed and advised [her] that he was assigned to investigate her grievance claiming sexual harassment" See, OSUMF (Docket No. 44-1), p. 3. Further, she states she was told by Sánchez that he would "tak[e] care" of her complaint against Rivera and was going to "forward [plaintiff's] case and take all actions." Id. Plaintiff's denial is non-responsive to the fact stated. See note 8.

[10] Plaintiff denies this statement, citing to her deposition testimony that Gabaldon "specifically informed and advised [her] that he was assigned to investigate her grievance claiming sexual harassment" See, OSUMF (Docket No. 44-1). p. 3. Further, she states she was told by Sánchez that he would "tak[e] care" of her complaint against Rivera and was going to "forward [plaintiff's] case and take all actions." Id. Plaintiff's denial is non-responsive to the fact stated. See note 8.

Plaintiff supplemented her interview statement with a copy of the letter she submitted to Sánchez and an addendum to the letter dated May 27, 2014. See, SUMF (Docket No. 37) ¶ 25, OSUMF (Docket No. 44-1), p.1. In the addendum, she described that, on April 23, 2014, Rivera tried to open the locked door to a cashier office at their workplace while another employee was using the space as a lactation room. See, SUMF (Docket No. 37) ¶ 26; OSUMF (Docket No. 44-1), p. 1. Plaintiff stated that after she and two other employees explained to Rivera why it was locked and told him he could not enter, he replied: "Why not? If I want to see." See, SUMF (Docket No. 37) ¶ 26; OSUMF (Docket No. 44-1), p. 1. She further recounted that Rivera once showed her a picture of a young woman on his cell phone and asked if she had ever been with a young male, which made plaintiff feel uncomfortable. See, SUMF (Docket No. 37) ¶ 28, OSUMF (Docket No. 44-1), p. 1; Docket No. 37-1, p. 3. Plaintiff did not report these incidents to her supervisors. See, SUMF (Docket No. 37) ¶¶ 27; 29; OSUMF (Docket No. 44-1), p. 1.[11]

### e. Disciplinary Action

On July 31, 2014, Gabaldon issued a Report of Investigation. See, SUMF (Docket No. 37) ¶ 30, OSUMF (Docket No. 44-1), p. 1. On September 8, 2014, Rosario notified Rivera that his excused absence was lifted pending a final agency decision, instructing him not to contact plaintiff unless "absolutely necessary." See, SUMF (Docket No. 37) ¶ 39; OSUMF (Docket No. 44-1), p. 1. Also, she told him the agency regarded the allegations as "very serious." See, SUMF (Docket No. 37) ¶ 39; OSUMF (Docket No. 44-1), p. 1. Plaintiff was informed that Rivera would be returning to the workplace, SUMF (Docket No. 37) ¶ 40; OSUMF (Docket No. 44-1), p. 1; was

---

[11] Plaintiff qualifies this statement, pointing to her deposition testimony to argue that Rivera's comments made her feel "uncomfortable." See, OSUMF (Docket No. 44-1), p. 5. Plaintiff's qualification is non-responsive to the fact stated. The evidence defendants refer to, to wit, plaintiff's statement (Docket No. 37-1), p. 4, supports the text.

instructed to avoid Rivera as much as possible (id.); and was urged to notify management immediately if Rivera failed to abide by the instructions he had received in writing. See, SUMF (Docket No. 37) ¶ 41; OSUMF (Docket No. 44-1), p. 1.

On October 1, 2014, plaintiff sent Gabaldon an email inquiring about the status of the case against Rivera, expressing concern that Rivera was allowed to be near her at the workplace. See, SUMF (Docket No. 37) ¶ 42; OSUMF (Docket No. 44-1), p. 1. Gabaldon forwarded the email to Everett, who referred the matter to Rosario. See, SUMF (Docket No. 37) ¶¶ 43, 44; OSUMF, p. 1. Rosario told Everett that plaintiff had not communicated to her or other supervisors any new concerns about Rivera. See, SUMF (Docket No. 37) ¶¶ 43-44; OSUMF (Docket No. 44-1), p. 1.

On October 24, 2014, plaintiff emailed Rosario stating: "I need a meeting with you because the orders of this memorandum have been violated by the other party." See, SUMF (Docket No. 37) ¶ 45; OSUMF (Docket No. 44-1), p. 1; Docket No. 37-23, p. 2. Rosario informed plaintiff of her availability and asked her when she would like to meet, stated she intended to give any issue prompt attention and recommended that, if plaintiff was scheduled to work that weekend, she should inform her supervisor if any issues with Rivera arose. See, SUMF (Docket No. 37) ¶ 46; OSUMF (Docket No. 44-1), p. 1. Plaintiff did not reply to Rosario's email and did not make any other attempts to meet with Rosario thereafter. See, SUMF (Docket No. 37) ¶ 47; OSUMF (Docket No. 44-1), p. 1.[12]

On January 2, 2015, Rosario sent Rivera a "Notice of Proposed Suspension of Five (5) Calendar Days." See, Docket No. 32-25, p. 1; SUMF (Docket No. 37) ¶ 48; OSUMF (Docket No.

---

[12] Plaintiff denies this statement, relying on her deposition testimony in which she stated that she "does not recall having met with Rosario on October 27, 2014." See, OSUMF (Docket No. 44-1), p.1. The denial is not responsive to the fact stated. Not recalling is "insufficient to create a genuine issue of fact." Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 13 (1st Cir. 2013).

44-1), p. 1.[13]  Rosario described the ice cream incident that transpired on May 23, 2014 and concluded that Rivera had engaged in conduct directly in violation of USDA regulations, including APHIS' Anti-Harassment Policy and Statement.  See, Docket No. 32-25, p. 2-3; SUMF (Docket No. 37) ¶ 49, OSUMF (Docket No. 44-1), p. 1.  She stated that, under the USDA Guide for Disciplinary Penalties, the penalty for a first offense of sexual misconduct ranged from a letter of reprimand to a 30-day suspension.  See, Docket No. 32-25, pp. 3, 4.  The notice apprised Rivera of his right to respond orally, in writing, or both.  See, SUMF (Docket No. 37) ¶ 49, OSUMF (Docket No. 44-1), p. 1.

On March 27, 2015, at Rivera's request, a meeting was held regarding the charges.  See, SUMF (Docket No. 37) ¶ 50.  During the meeting, Rivera stated that Traverzo wanted to submit a new witness statement, which Traverzo provided on April 24, 2015.  See, SUMF (Docket No. 37) ¶ 50.[14]  On May 11, 2015, APHIS issued a Decision Letter on Proposed Suspension of Five (5) Calendar Days.  See, SUMF (Docket No. 37) ¶ 51.[15]  The letter expresses that, notwithstanding Traverzo's new statement, the evidence on record support the charges against Rivera and warrant the proposed suspension.  See, SUMF (Docket No. 37) ¶ 50; Docket No, 32-26.[16]  And it repeats the basis for suspension articulated in the Notice of Proposed Suspension.  See, Docket No. 32-36.

---

[13] Plaintiff qualifies the statement, arguing that the suspension notice "pointedly concludes that Rivera engaged in serious sexual misconduct and unwelcomed sexual advances" toward plaintiff and that plaintiff was affected by this "prohibited conduct."  See, OSUMF (Docket No. 44-1), p. 5. Plaintiff's qualification is argumentative and merely rephrases the facts stated immediately thereafter in SUMF (Docket No. 37) ¶ 49, which plaintiff admits.  See, OSUMF (Docket No. 44-1), p. 1.

[14] The record is unclear as to the content of Traverzo's new statement.

[15] Plaintiff qualifies the statement, arguing that the Letter of Decision "repeatedly makes reference that Eliud Rivera did engage in serious misconduct and committed a serious 'infraction'" and that Rivera's behavior was "extremely inappropriate."  The qualification is non-responsive to the fact stated.

[16] Plaintiff qualifies the statement, arguing that the Letter of Decision "repeatedly makes reference that Eliud Rivera did engage in serious misconduct and committed a serious 'infraction'" and that Rivera's behavior was "extremely inappropriate."  The qualification is non-responsive to the fact stated.

Hence, APHIS imposed a five-calendar day suspension, which Rivera served from June 1 to June 5, 2015.  See, SUMF (Docket No. 37) ¶ 51; OSUMF (Docket No. 44-1), p. 1.[17]  To determine the level of sanction, Rosario considered the effect of Rivera's actions on plaintiff, his length of service, and his previous performance.  See, Docket No. 32-25, p. 4.

###    f.  Informal EEO Counseling, Jacket Incident, Formal Complaint

On December 7, 2015, plaintiff initiated informal EEO counseling regarding her sexual harassment claim against Rivera.  See, SUMF (Docket No. 37) ¶ 52.[18]  Prior to this date, she had not approached APHIS' Office of Civil Rights, Diversity and Inclusion, nor had she sought counseling from an EEO counselor.  See, SUMF (Docket No. 37) ¶ 52.[19]  The matter was not resolved, and, on February 17, 2016, the EEO Specialist issued a Notice of Right to File a formal EEO complaint.  See, SUMF (Docket No. 37) ¶ 53; OSUMF (Docket No. 44-1), p. 1; Docket No. 32-28.

---

[17] Plaintiff qualifies the statement, arguing that the Letter of Decision "repeatedly makes reference that Eliud Rivera did engage in serious misconduct and committed a serious 'infraction'" and that Rivera's behavior was "extremely inappropriate."  The qualification is non-responsive to the fact stated.

[18] Plaintiff denies this statement, claiming that she "expressly requested that her sexual harassment complaint EEO case against Eliud Rivera continue its due course with the USDA."  In support, she cites a July 31, 2015 letter to Leyinska Wisovitch, State Plan Health Director at APHIS, in which one of her attorneys refers to the complaint that AICB investigated as an EEO complaint (Docket No. 44-4).  The denial is conclusory and the evidence used to support it argumentative.  In her deposition plaintiff was asked when was "the first time that [she] contacted an EEO officer" (Docket No. 44-3, p. 115, lines 20-22), to which she responded that she did not remember ("I don't remember, sir").  Id. at p. 115, line 23.  She was then asked, "Does December of 2014 ring a bell? 2015 ring a bell?" (Id. at p. 115, lines 24-25).  Plaintiff responded, "I don't remember."  Id. at p. 116, line 1.  The Final Agency Decision ("FAD") states that plaintiff initiated EEO counseling on December 7, 2015 (Docket No. 37-27, p. 1).  No objections were raised in connection with the FAD or its content.  Further, responding to plaintiff's email on the jacket incident, Lauren Hill (EEO counselor), informed plaintiff on February 22, 2016, that she (Hill) had closed plaintiff's informal complaint and issued a Notice of Right to File (Docket No. 3-28, p. 1).  Furthermore, plaintiff was asked in her deposition whether it was not true that "at the moment [plaintiff sent the message on the jacket incident to Ms. Hill on February 10, 2016] [plaintiff's] informal EEO process …. was underway … (Docket No. 44-3, p. 127, lines 18-22).  Plaintiff answered, "Yes, sir."  Id. at p. 127, line 23.  Considering all of these elements, it is reasonable to conclude that by February 2016 plaintiff was involved in an informal EEO process that followed the initial EEO counseling that she began on December 7, 2015.

[19] Plaintiff denies this statement, claiming that she "expressly requested that her sexual harassment complaint EEO case against Eliud Rivera continue its due course with the USDA." In support, she cites a July 31, 2015 letter to Leyinska Wisovitch, State Plan Health Director at APHIS, in which her attorneys refer to the complaint AICB investigated as an EEO complaint (Docket No. 44-4). The denial is conclusory and the evidence used to support it argumentative.

On January 14, 2016, plaintiff had another incident with Rivera, in which he snatched a jacket that was draped over the back of a chair while plaintiff was sitting on it. See, SUMF (Docket No. 37) ¶ 54; OSUMF (Docket No. 44-1), p. 1. In her written account of the incident, she wrote that Rivera pulled a black jacket that was laid in the chair that plaintiff was seated on "[b]rushing her buttocks, [] low back and back." See, SUMF (Docket No. 37) ¶ 54; OSUMF (Docket No. 44-1), p. 1. On February 10, 2016, she emailed this account to Eunice Everett, who referred the matter to supervisor José Jiménez. See, Docket No. 50-5, ¶ 3-4. On February 19, 2016, plaintiff reported the jacket incident to Lauren D. Hill, EEO specialist in charge of plaintiff's informal EEO complaint against Rivera. See, SUMF (Docket No. 37) ¶ 57, OSUMF (Docket No. 44-1), p. 1.

After being informed of the incident, José Jiménez followed up with plaintiff, seeking clarification about her statement that Rivera "brush[ed] [her] buttocks, low back, and back." See, Docket No. 50-5, ¶ 5. In response, plaintiff sent Jiménez a revised statement stating that the jacket, rather than Rivera himself, brushed her buttocks, lower back, and back. See, Docket No. 50-5, ¶ 6. (In her deposition during discovery as part of this case, plaintiff later stated that Rivera touched her with his hand.) See, Docket No. 44-3, p. 123.[20] Jiménez contacted the employees that plaintiff had named as witnesses, as well as Rivera, none of whom corroborated plaintiff's account of the event. See, SUMF (Docket No. 37) ¶ 58.[21]

---

[20] According to plaintiff, José Jimenez's Declaration under Penalty of Perjury should be stricken from the record because it was filed as part of the reply, and the attachments to the Declaration were not notified along with Initial Disclosures (Docket No. 56, p. 2). The request is denied, as the court is persuaded by the substantive arguments included in defendants' "Response to Plaintiff's Request for Exclusion of Evidence" (Docket No. 58), which plaintiff did not challenge.

[21] Plaintiff qualified this statement, stating that other employees corroborated that they were present on the day of the alleged incident but did not remember any incident (Docket No. 44-1, p. 5, ¶ 58). Not recalling an event means that the event has not been confirmed.

On March 2, 2016, plaintiff submitted through counsel a formal EEO Complaint alleging that APHIS subjected her to gender-based discrimination, sexual harassment and retaliation. See, SUMF (Docket No. 37) ¶ 59; OSUMF (Docket No. 44-1), p. 1; Docket No. 32-32, p. 1. The Complaint did not include, describe or summarize the jacket incident or any other incident. See, SUMF (Docket No. 37), ¶ 60. On May 6, 2016, the USDA Office of Adjudication issued the FAD, dismissing the EEO complaint due to untimeliness and failure to state a claim. See, SUMF (Docket No. 37) ¶ 65; OSUMF (Docket No. 44-1), p. 1.

The FAD states that on March 2, 2016, plaintiff filed a formal EEO complaint alleging that APHIS subjected her to discrimination and harassment (sexual) and reprisal (prior EEO activity) when on May 24, 2014, she was sexually harassed by a colleague, and that management failed to properly address the incident by retaining the alleged harasser as an employee (Docket No. 37-27, p. 1). It indicates that management immediately separated plaintiff and her alleged harasser; a subsequent investigation ensued as a result of which the harasser was administratively disciplined; and the parties were given instructions to have only work-related contact with each other only when absolutely necessary. Id. at pp. 1-2. Also, it points out that the Port Director spoke to plaintiff on September 5, 2014, and plaintiff had not reported other incidents of harassment prior to the filing of the EEO Complaint. Id. at p. 2. It concludes that if plaintiff was not satisfied with management's handling of her claim, she should have initiated EEO Counselor contact within 45 days of September 5, 2014 rather than more than two years later. Id. at p. 2.[22]

---

[22] The record does not reflect a two-year lapse, but a delay of approximately one year and three months (from September 2014 to December 2015).

### g.  Post-Investigation Working Conditions

Plaintiff is never alone with Rivera (Docket No. 44-3, p. 108, lines 2-7).  She can determine whether to work on one shift or another and swaps shifts with co-workers so she does not have to work with Rivera (Docket No. 44-3, p. 97, lines 6-15).  If he comes in, she leaves the area (Docket No. 44-3, p. 108, lines 10-12).  She understands that Rivera is worried because he is not working with her (Docket No. 44-3, p. 110, lines 15-16).

Since Rivera was reinstated after the forced leave of absence, he has not addressed plaintiff to speak about non-work matters; offered her meals, ice cream, candy or drinks of any sort; made any comments to her about being with young people; and not expressed interest in seeing women expressing breast milk (Docket No. 44-3, p. 107 lines 12-p. 108 line 19).  Further, plaintiff did not report any incident that could properly be described as a recurrence of the conduct she had complained about earlier (Docket No. 44-3, p. 60 line 19 – p. 61 line 7; p. 116 lines 2-18; p. 130 lines 10-15).

Nevertheless, plaintiff believes Rivera acts arrogantly by whistling and singing, and staring at her.  <u>See</u>, SUMF (Docket No. 37) ¶ 64; OSUMF (Docket No. 44-1), p. 1.  According to plaintiff, Rivera has arrived at the office prior to the beginning of his assignments while she is still working her shift.  <u>See</u>, SUMF (Docket No. 37) ¶ 64; OSUMF (Docket No. 44-1), p. 1.  She claims Rivera has delivered documents in areas where she was present even though this task could have been delegated.  <u>See</u>, SUMF (Docket No. 37) ¶ 64; OSUMF (Docket No. 44-1), p. 1.  Also, that when she is about to leave an area and looks around to get her purse, Rivera is looking at her as if he

wanted to eat her with his eyes (Docket No. 44-3, p. 146, lines 6-10). Plaintiff did not report to

the employer these instances of alleged misbehavior.[23]

After May 2014, plaintiff has been commended for her good services and received

monetary awards for her performance See, SUMF (Docket No. 37) ¶ 79; OSUMF (Docket No. 44-

1), p. 1. She stated to be performing her duties in an excellent manner. See, SUMF (Docket No.

37) ¶ 79; OSUMF (Docket No. 44-1), p. 1. Her pay grade has increased, and she has regularly

assigned herself overtime. See, SUMF (Docket No. 37) ¶ 76, OSUMF (Docket No. 44-1), p. 1.[24]

## III. DISCUSSION

### a. Title VII Claims

Plaintiff complains of sexual harassment, hostile work environment and retaliation in

violation of Title VII (Docket No. 1, pp. 1, 15; Docket No. 44, p. 1). Title VII prohibits employers

from discriminating against "any individual with respect to … compensation, terms, conditions,

or privileges of employment because of such individuals, race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). The "phrase 'terms, conditions, or privileges of employment'

evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and

women in employment, which includes requiring people to work in a discriminatorily hostile or

abusive environment." Franchina v. City of Providence, 881 F.3d 32, 45 (1st Cir. 2018). In

---

[23] By plaintiff's account, after May 24, 2014 (when she spoke with her supervisor about Rivera) and before 2015, she did not report any other incident against Rivera "except the jacket incident." See, Plaintiff's Deposition (Docket No. 44-3), p. 60 line 19 – p. 61 line 7. (The jacket incident, however, was not in 2015 but on January 14, 2016, Docket No. 37-28, p. 2.). Further, she testified not remembering any reports of incidents with Rivera in 2015. Id. at p. 116, lines 2-18. And she stated that after January 14, 2016, she did not report any other incident involving Rivera. Id. at p. 130, lines 10-15. She informed Lauren Hill and Supervisor Jiménez about the jacket incident in February 2016.

[24] Overtime assignment is determined by APHIS's operational needs (Docket No. 37, ¶ 74; Docket No. 44-1, p. 1). It varies according to extraneous situations such as incoming, outgoing and delayed flights which compromise the time upon which a shift ends. Id. On this account, it is considered work carried out outside of regular shifts, and includes Sunday work (Docket No. 37, ¶ 75, Docket No. 44-1, p. 1).

consequence, sexual harassment is a recognized form of sex discrimination under Title VII. See,

Meritor Sav. Bank v. Vison, 477 U.S. 57, 66 (1986)(analyzing concept).

In addition, Title VII makes it unlawful for the employer to retaliate against a person who

complains about discriminatory employment practices. See, 42 U.S.C. § 2000e-3(a)(stating

prohibition).[25] The provision seeks to prevent employer interference with unfettered access to the

statute's remedial mechanisms, by prohibiting employer actions that are likely to deter victims of

discrimination from complaining to the EEOC, the courts, and their employers. See, Burlington

N. & Santa Fe Ry. Co., 548 U.S. at 68 (addressing topic).[26]

### i. Sex-Based Hostile Work Environment

To prevail on a sex-based hostile work environment claim, plaintiff must show that: (1)

she is a member of the protected class; (2) she was subjected to unwelcome sexual harassment; (3)

the harassment was based in part on sex; (4) the harassment was sufficiently severe or pervasive

so as to alter the conditions of plaintiff's employment and create an abusive work environment;

(5) sexually objectionable conduct was both objectively and subjectively offensive, such that a

reasonable person would find it hostile or abusive and the plaintiff in fact did perceive it to be so;

and (6) there is some basis for employer liability. See, Roy v. Correct Care Solutions, LLC., 914

F.3d 52, 61-62 (1st Cir. 2019)(articulating and explaining test). This standard "takes a middle path

---

[25] Plaintiff refers to sexual harassment and hostile work environment as different categories of discrimination (Docket No. 44, p. 1). The court examines the alleged harassment in connection with a discriminatory hostile work environment action and as a modality of retaliation, for Title VII makes discrimination and retaliation "separate wrongs." Berry v. Delta Airlines, Inc., 260 F.3d 803, 809 (7th Cir. 2001). The statute's "substantive provision seeks to prevent injury based on who people are, i.e. their status." Burlington Northern and Santa Fe Ry.Co. v. White, 548 U.S. 53, 63 (2006). In contrast, the "anti-retaliation provision seeks to prevent harm to individuals based on what they do, i.e. their conduct." Id.

[26] Unlike for its private-sector counterpart, Title VII does not have an express antiretaliation provision applicable to the federal government as employer. See, Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)(so acknowledging). Nonetheless, the First Circuit has assumed that the antiretaliation provision applicable to private sector employers operates to prohibit retaliation in the federal sector. Id.

between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." <u>Aponte-Rivera</u> v. <u>DHL</u>, 650 F.3d 803, 808 (1st Cir. 2011).

## 1. Exhaustion

The USDA contends that plaintiff failed to timely exhaust administrative remedies (Docket No. 36-1, p. 4). As originally enacted in 1964, "Title VII did not apply to the federal government." <u>Rodríguez</u> v. <u>United States</u>, 852 F.3d 67, 76 (1st Cir. 2017). This was accomplished by excluding the federal government from the definition of "employer." <u>Id.</u> As a result, each of the substantive provisions of Title VII prohibiting employment discrimination applied at that time only to non-government employers, including employment agencies, labor organizations, and various types of training programs. <u>Id.</u> In 1972, however, Congress enacted the Equal Employment Opportunity Act, amending Title VII to extend its coverage to federal employees. <u>See</u>, <u>Brown</u> v. <u>General Services Administration</u>, 425 U.S. 820, 825-835 (1976)(examining amendment).[27] Rather than simply amend the definition of "employer" to include the United States, "Congress created an entirely new section," Section 717(a), 86 Stat. at 111 (codified as amended at 42 U.S.C. § 2000e-16(a)). <u>Rodríguez</u>, 852 F.3d at 77. The Section is specifically – and only – applicable to federal employment. <u>Id.</u> With the amendment, Congress intended to accord aggrieved federal applicants and employees the full rights available in the courts as are granted to individuals in the private sector under Title VII. <u>Id.</u>

With this in mind, an aggrieved federal employee may now file a Title VII action in federal district court. <u>See</u>, <u>Vera</u> v. <u>McHugh</u>, 622 F.3d 17, 29 (1st Cir. 2010)(so acknowledging)(quoting <u>Brown</u>, 425 U.S. at 832). Yet, prior to doing so, "the complainant must seek relief in the agency

---

[27] <u>See also</u>, II Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law 32-3- 32-19 (5th Ed. 2012) (describing Title VII's coverage of federal employees).

that has allegedly discriminated against [her]." Vera, 622 F.3d at 29. A federal court will not entertain a federal employee's discrimination claim brought under Title VII "unless administrative remedies have first been exhausted." Rodríguez, 852 F.3d at 78. The procedure to seek relief is not statutorily prescribed. See, Román-Martínez v. Runyon, 100 F.3d 213, 216 (1st Cir. 1996)(discussing topic). Nonetheless, Title VII grants to the Equal Employment Opportunity Commission ("EEOC") authority to "issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out" its enforcement responsibilities under the federal-employment section of the statute. 42 U.S.C. § 2000e -16(b).

Pursuant to this authority, the EEOC issued regulations setting forth the procedure to be followed in seeking EEO relief. This procedure must be carefully pursued. See, Employment Discrimination Law, supra at p. 32-20 ("Federal employees must follow carefully the applicable administrative procedures and time provisions prescribed, which the Supreme Court described as preconditions that Congress attached to the right to sue")(citing in part Brown, 425 U.S. at 833)). To start the process, the aggrieved person must consult an EEO counselor within 45 days of the date of the matter alleged to be discriminatory or the effective date of the personnel action in question prior to filing a complaint, in order to try to informally resolve the matter. See, Vera, 622 F.3d at 29 (describing process).

If the matter is not resolved through counseling, the employee may file an administrative complaint with the agency. 29 C.F.R. § 1614.106(a). Should the agency issue a final decision adverse to the employee, the employee may either appeal that decision to the EEOC Office of Federal Operations or file a civil action in federal court. 29 C.F.R. §§ 1614.110, 1614.401, 1614.407. Failure to follow these steps bars the employee from bringing a later court action based

on that allegedly discriminatory conduct. See, Randall v. Potter, 366 F.Supp.2d 104, 113 (D. Me. 2005)(citing Jensen, 912 F.2d at 520).

The regulations do not define the term "initiate contact." For the EEOC, however, a complainant may satisfy the criterion of EEO-counselor contact by initiating contact with any agency official logically connected with the EEO process even if that official is not an EEO Counselor, and by exhibiting an intent to begin the process. See, Pagán v. United States, 2016 WL 3910260, at *3 (D.P.R. July 14, 2016)(examining issue)(citing Culpepper v. Shafer, 548 F.3d 1119, 1122 (8th Cir. 2008)).

On this basis, the USDA claims that the action is untimely (Docket No. 36-1, pp. 1-2).[28] Plaintiff initiated the informal EEO counsel regarding her harassment claims against Rivera in December 2015, way outside the 45-day window even though by May 2014 (harassment) and at the latest by September 2014 (when Rivera was reinstated) she had knowledge of the behavior she complained about. She, however, claims that she timely initiated the EEO process when she informed Sánchez and Gabaldon of the ice cream incident because they had a duty to report the complaint to OCRDI (Docket No. 44, p. 10).[29] Yet neither plaintiff's immediate supervisor nor the AICB investigator was an "agency official[…] logically connected with the EEO process."

---

[28] The Supreme Court has held that failure to file a timely charge is not an absolute jurisdictional prerequisite to suit that would deprive courts of subject matter jurisdiction. See, Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) (so holding). From this perspective, "Title VII's charge-filing requirement is a processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the adjudicatory authority of the courts." Fort Bend County v. Davis, ---S.Ct.---- (2019), 2019 WL 2331306, *6 (S.Ct. June 3, 2019). The same approach has been followed in connection with the period to contact the EEO counselor. See, Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990)(EEO counselor-contact period "not jurisdictional"); Boos v. Runyon, 201 F.3d 178, 182 (2nd Cir. 2001)(while weighty, the exhaustion requirement is not jurisdictional). That said, exhaustion is no small matter, as it is a condition to waiver of sovereign immunity in actions involving the United States and, thus, must be strictly construed. See, Rodriguez, 852 F.3d at 79 (addressing topic). Unless an exception applies, failure to exhaust the administrative process will bar the courthouse door. See, Velázquez-Ortiz v. Vilsack, 657 F.3d 64, 71 (1st Cir. 2011)(so recognizing). As the Supreme Court recently warned, "[a] Title VII complainant would be foolhardy consciously to take the risk that the employer would forgo a potentially dispositive defense." Davis, ---S.Ct.----, 2019 WL 2331306 at *7.

[29] As support, plaintiff relies on the APHIS' Anti-Harassment Policy Statement, arguing that it establishes that "all supervisors have a duty to inform and take prompt action to prevent and remedy sexual harassment" (Docket No. 44, p. 10). While the policy instructs managers and supervisors to "address any and all complaints of harassment," it specifically charges employees with the

At the time plaintiff brought to his attention the Rivera incident, Sánchez was a Supervisory PPQ officer (Docket No. 37, ¶ 6; Docket No. 44-1, p. 1). There is no evidence to suggest that he had any duties related to the EEO process or that he counseled plaintiff about filing a claim. Moreover, Gabaldon met with plaintiff in his capacity as AICB Personnel Misconduct Investigator, which supports APHIS in investigating allegations of misconduct (Docket No. 37, ¶ 22-24). And the record does not show that he was involved with the EEO process. <u>See</u>, <u>Murphee</u> v. <u>Commissioner</u>, 644 Fed.Appx. 962, 966 (11th Cir. 2016)(plaintiff did not satisfy the 45-day requirement when he contacted primary and secondary supervisors because they were "not EEO personnel or officials in an office of civil rights or equivalent position," even though their duties included addressing employee discrimination complaints); <u>Murphy</u> v. <u>Mattis</u>, 2017 WL 1157086, at *37 n.74 (D. Me. Mar. 27, 2017)(rejecting plaintiff's argument that he initiated EEO contact, as his supervisors and managers were not closely associated with the EEO process and workplace discrimination).

In this realm, alternate grievance processes do not replace the EEO process. <u>See</u>, <u>Carter</u> v. <u>Greenspan</u>, 304 F.Supp.2d 13, 22-24 (D.D.C. 2004)(the fact that plaintiff engaged in a dispute resolution procedure with his supervisors and a human resources representative does not replace the required initial contact with an EEO counselor within 45 days of the allegedly offensive conduct)(<u>citing in part</u> <u>Steiner</u> v. <u>Henderson</u>, 194 F.Supp.2d 688, 689-691 (N.D. Ohio 2002), <em>aff'd</em> 354 F.3d 432 (6th Cir. 2003)(plaintiff's pursuit of grievances through supervisory channels did not excuse her from timely contacting EEO counselor)); <u>Arnold</u> v. <u>Donahue</u>, 2011 WL 2596884, *1,

---

responsibility to file their EEO claims with OCRDI (Docket No. 37-35). The policy statement reiterates the procedure the EEOC established in 29 C.F.R. §1614.105, to the effect that: "any employee making a complaint of harassment based on a protected basis must contact the APHIS Office of Civil Rights, Diversity and Inclusion (OCRDI) Counseling and Resolution Branch…within 45 days of the incident" (Docket No. 37-35). Plaintiff admitted having seen the Policy Statement (Docket No. 37, p. 10, ¶ 37). Further, she received training on the agency's policies regarding anti-harassment policies and procedure (Docket No. 37-34, pp. 2-5).

*2 (EEOC June 23, 2011)(applying 29 C.F.R. § 1614.405(b) to reject contention that complainant satisfied 45-day exhaustion requirement when she informed management of the alleged sexual harassment because utilization of other agency procedures and remedial processes does not toll the time limit for contacting the EEO counselor). As the Supreme Court stated in a related context, pendency of a grievance or some other method of collateral review of an employment decision "does not toll the running of the limitations period." Delaware State College v. Ricks, 449 U.S. 250, 261 (1980)(citing Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO, Local 790 v. Robbins & Myers, Inc., 429 U.S. 229, 236 (1976)(rejecting argument that "the statutory period for filing a claim with the EEOC" should be tolled "during the pendency of grievance or arbitration procedures under the collective bargaining contract")).

Relying on National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), plaintiff argues that she timely initiated the EEO process as to all of Rivera's conduct because on February 19, 2016, less than 45 days after the jacket incident, she sent by email a message regarding the incident to Lauren D. Hill, an EEO Specialist for the OCRDI (Docket No. 44, p. 12; Docket No. 56, p. 12). In Morgan, the Supreme Court held that a hostile work environment consists of a series of separate acts which together constitutes one unlawful employment practice, and so long as one act contributing to the claim occurs within the charge-filing period, the entire time period of the hostile work environment may be considered by a court for the purpose of determining liability. Id. at 117.[30] Thus, at first glance, coupling the jacket incident with Rivera's past behavior would appear

---

[30] Morgan deals with the statutory deadline for filing an EEOC charge and not the 45-day regulatory requirement for contact with an EEO counselor. See, 536 U.S. at 104. Unlike the statutory charging deadline, the EEO-contact period is not a period to file formal claims, but a period within which the employee must present a grievance for conciliation. See, Román-Martínez, 100 F.3d at 217 (explaining difference between statutory charging period and regulatory EEO contact period). If conciliation fails, a period for filing a formal complaint follows. Id. Still, both mechanisms open up a space for early conciliation. And so, courts have applied Morgan to the 45-day regulatory limit. See, Greer v. Paulson, 505 F.3d 1306, 1313 (D.C.Cir. 2007)(suggesting that Morgan standard applies to the 45-day period); Lyons v. England, 307 F.3d 1092, 1106 n.6 (9th Cir. 2002)(noting in connection with the 45-day period, that the "mandatory nature of the federal regulation is sufficient to warrant full application of the Morgan rule).

to have saved the day for both the former and the latter.[31]  Yet a closer look at Morgan leads to a

different conclusion, as the Supreme Court also noted that a Title VII plaintiff cannot recover for

acts that occurred before the filing period if such acts are no longer part of the same hostile work

environment claim because of certain intervening action by the employer.  Id. at 118.[32]  And

prompt action by the employer to effectively resolve the harassment constitutes intervening action.

See, Watson v. Blue Circle, Inc., 324 F.3d 1253, 1258-1259 (11th Cir. 2003)(applying Morgan to

conclude that conduct which ceased after plaintiff reported it to the employer was no longer part

of plaintiff's hostile work environment claim); Fairley v. Potter, 2003 WL 403361, *10 (N.D. Cal.

Feb. 13, 2003)("Because the court finds that the only claim [plaintiff]… administratively

exhausted is not actionable [the harassment ceased after plaintiff reported it and the employer took

prompt action to remedy the situation], the other incidents cannot be sustained as part of the same

alleged practice").[33]

By plaintiff's admission, the conduct she complained of ceased after she reported it to

Sánchez on May 24, 2014.  The USDA placed Rivera on involuntary leave of absence from May

28, 2014 until September 9, 2014, and following plaintiff's contact with Sánchez, Rivera did not

speak with plaintiff about things other than work; did not offer plaintiff meals, ice cream, candy

or drinks of any sort; did not make any comments to her about being with young people; and did

---

[31] That an employee did not contact EEO counselor to timely report instances of discrimination within the reach of the limitations period does not prevent her from bringing forth a discrimination claim based on a subsequent event, if she contacts the EEO counselor within 45 days of the event that triggers that claim.  See, Jensen, 912 F.2d at 520 (examining proposition).

[32] In the same vein, see Nieves-Borges, 936 F.3d at 8-9 ("[W]e may consider the defendant['s] alleged behavior in the early years of [the plaintiff's] employment **only if** at least one of the incidents that occurred after … the earliest date within the limitations period [   ] **constitutes part of the same hostile work environment as the alleged wrongful conduct that preceded that date**")(**emphasis added**)(quoting Maldonado-Cátala v. Municipality of Naranjito, 876 F.3d 1, 10 (1st Cir. 2017)).

[33] See also, Tucker v. United Parcel Service, 2017 WL 2623172, *7 (M.D. La. June 15, 2017)(when informed of allegedly harassing incident, supervisor called harasser into his office and counseled him about his conduct; the employer's intervening action severed "the acts that preceded it from those subsequent to it").  As the plaintiff did not appeal this aspect of the Court's ruling, dismissal of the action was affirmed on other grounds.  See, Tucker v. United Parcel Service, 734 Fed.Appx. 937, 938 (5th Cir. 2018).

not refer to having an interest in or wishing to see women expressing milk (Docket No. 37-34, p. 30). Similarly, there is no evidence that Rivera repeated the ice cream-cone gestures that understandably bothered plaintiff and led her to report him to Sánchez in the first place. Further, the record does not reflect any instance or incident that could be reasonably characterized as a recurrence of the conduct that plaintiff had complained about. In consequence, the agency's intervening action placed the pre-jacket conduct outside of the realm of the hostile work environment claim arising out of the jacket incident.

As for that incident, plaintiff sent an email to Lauren Hill, the EEO Specialist handling plaintiff's informal EEO counseling and as such, an official logically connected with the EEO process. See, Kraus v. Presidio Trust Facilities Div./Residential Management Branch, 572 F.3d 1039, 1045 (9th Cir. 2009)(recognizing that an EEO officer is logically connected to the EEO process, for she facilitates contact between agency employees and EEO counselors and advises employees about the EEO complaint process). However, the email does not evince the intent necessary to begin the EEO process. Even though it includes a description of the incident, it falls short, stating, "I sent this to my supervisors as well. For your knowledge" (Docket No. 37-28, p. 2). But more is needed to satisfy the exhaustion requirement. See, Welsh v. Hagler, 83 F.Supp.3d 212, 221 (D.D.C. 2015)(plaintiff did not communicate requisite intent with email titled "complaint" which described discriminatory incident but did not ask recipients to take action or follow up on official's response); Charlie O., Complainant v. Erick K. Fanning, Secretary, Dept. of the Army, Agency, 2016 WL 4157470, *3 (EEOC 2016)(complainant did not exhibit intent necessary to begin the EEO process in email stating that he was forwarding the email detailing events leading to his termination to an upper level supervisor "in hopes that this treatment does

not occur to anyone else," but requested no further action).[34]  And plaintiff never brought to the attention of anybody, much less the EEO contact, Rivera's alleged whistling, singing or staring.

Plaintiff states the government should be estopped from asserting noncompliance with the exhaustion requirement, claiming there was an adequate equitable tolling by her (Docket No. 44, p. 10; Docket No. 56, p. 7).  The time period for filing a charge is subject to equitable doctrines such as tolling or estoppel.  <u>See</u>, <u>Vera</u>, 622 F.3d at 30 (acknowledging principle).  The First Circuit has recognized two related doctrines through which a plaintiff may modify or avoid the Title VII period: equitable estoppel and equitable tolling.  <u>Id.</u> Equitable estoppel is appropriate when an employee is aware of her Title VII rights but does not make a timely filing due to her reasonable reliance on her employer's misleading or confusing representations or conduct.  <u>Id.</u>  The employee must show evidence of either the employer's improper purpose or his constructive knowledge of the deceptive nature of his conduct.  <u>Id.</u>  That evidence must be in the form of some definite, unequivocal behavior fairly calculated to mask the truth or to lull an unsuspecting person into a false sense of security.  <u>Id.</u>  In determining the applicability of an equitable remedy, a court must also look to any countervailing equities against the plaintiff, such as whether she diligently pursued the claim.  <u>Id.</u>

Plaintiff maintains that she timely brought a grievance; Sánchez said he was going to take all actions; and Gabaldon expressed that he was assigned to investigate her grievance of sexual harassment (Docket No. 44, p. 12; Docket No. 56, p. 7).  She posits that under the USDA's sexual harassment policy, supervisory personnel have a duty to inform and take prompt action to prevent

---

[34] <u>Compare with</u>, <u>Culpepper</u>, 548 F.3d at 1123-1124 (plaintiff showed intent to begin EEO process by stating, "I would request that the informal phase be waived and the formal phase begin with this complaint and supporting documentation. If not consider this my official contact to begin on the process").

and remedy sexual harassment; Sánchez and Gabaldon should have referred plaintiff's complaint to the Office of Civil Rights; and that they "failed to refer, as promised to her, the May 24, 2014 sexual harassment grievance to the USDA's EEO office and take all appropriate steps to forward the case" (Docket No. 56, pp. 7-8).

APHIS' Anti-Harassment Policy Statement charges employees with the responsibility to file their EEO claims with OCRDI (Docket No. 37-35). The policy statement reiterates the procedure the EEOC established in 29 C.F.R. § 1614.105, to the effect that, "any employee making a complaint of harassment based on a protected basis must contact the APHIS Office of Civil Rights, Diversity and Inclusion (OCRDI) Counseling and Resolution Branch…within 45 days of the incident" (Docket No. 37-35). Plaintiff admits having seen the Policy Statement (Docket No. 37, p. 10, ¶ 37). She received training on the agency's anti-discrimination policies (Docket No. 44-3, p. 116, lines 17-21), as well as on those regarding anti-harassment policies and procedure. Id. at p. 13, lines 20-23, p. 29, line 25, p. 30, line 6, and p. 36, lines 20-24.

Lack of knowledge did not prevent plaintiff from initiating informal EEO counseling, which she belatedly did on December 7, 2015 (Docket No. 37, Exhibit 26, p. 1), after lapse of the 45-day mandatory exhaustion period. No excusable ignorance justifies her failure to timely contact the EEO counselor. See, Kale v. Combined Ins. Co. of America, 861 F.2d 746, 753 (1st Cir. 1988)("If the court determines that the plaintiff had actual or constructive knowledge of his rights, then ordinarily there could be no equitable tolling"); Arnold, 2011 WL 25966884 at *2 (complainant could not show extraordinary circumstances excusing failure to timely contact EEO counselor in part because record did not show that she was unaware of the EEO process); O'Neal v. Johnson, 2003 WL 21788956, *2 (D.D.C. Jul. 17, 2003)(summary judgment granted to

defendant in case where plaintiff had previously received information about the 45-day period to initiate EEO process).

What is more, contrary to what plaintiff asserts, there is no evidence that either Sánchez or Gabaldon promised her to refer the matter to the EEO office. Plaintiff's written statement to Sánchez does not mention APHIS's Anti-Harassment Policy Statement or state that plaintiff wished to discuss her claims with an EEO counselor (Docket No. 37-5). Her written statement only refers to APHIS's Workplace Violence Prevention Policy- copy of which may be found and read at Docket No. 50-6 -not to OCRDI or EEO procedures. In fact, at no time during her interview with Gabaldon or throughout the investigation did plaintiff express a belief or understanding that Gabaldon was conducting an EEO investigation. So, not only does the record reflect no deceptive conduct attributable to USDA, it reflects no deceptive conduct at all. See, Román-Martínez, 100 F.3d at 219-220 (relaying claims to supervisor rather than to EEO counselor does not satisfy administrative requirement in absence of evidence that supervisor ever held out to plaintiff as being the EEO counselor); Greenspan, 304 F.Supp.2d at 23 (refusing to equitably toll 45-day period owing in part to lack of evidence that plaintiff was misled into thinking that employee relations specialist was an EEO counselor).

Equitable doctrines are to be applied "sparingly," as the First Circuit takes a "narrow view of equitable exceptions to Title VII exhaustion requirements." Vera, 632 F.3d at 30 (quoting Frederique-Alexandre v. Dep't of Nat'l & Envtl. Res., 478 F.3d 433, 440 (1st Cir. 2007)). By extension, there is no occasion to apply those doctrines here, for plaintiff cannot reasonably assert ignorance and she was not actively misled into failing to timely contact an EEO counselor in accordance with established procedure. See, Vera, 622 F.3d at 33 (rejecting estoppel argument because agency did not actively mislead plaintiff about her rights or attempt to deceive her through

false representations)(citing Ott v. Midland-Ross Corp., 600 F.2d 24, 29-30 (6th Cir. 1979) (finding of estoppel may be appropriate when employer falsely assured employee that it would settle the claim by appointing him to a new position) and Bonham v. Dresser Indus, Inc., 569 F.2d 187, 193 (2nd Cir. 1977)(finding estoppel potentially applicable when no notice of ADEA rights was posted and employer falsely indicated to employee that there would be another position for him within the company)).

The exhaustion requirement is part of "a careful blend of statutory and judicial enforcement powers" imposing upon federal employees a duty to pursue and exhaust administrative remedies as the functional equivalent of a condition precedent to pursuing Title VII claims in court. Román-Martínez, 100 F.3d at 221 (quoting Brown, 425 U.S. at 833). Because plaintiff inexcusably failed to comply with that duty, she has no right to relief as to the issues she did not timely exhaust during prior agency proceedings. Under these circumstances, her hostile work environment claims must be appropriately dismissed for failure to timely exhaust administrative remedies. See, Román-Martínez, 100 F.3d at 216-218 (federal employee's failure to contact EEO counselor within the regulatory contact period causes him to lose his right to pursue a later de novo action in court on non-exhausted issues); Murphy, 2017 WL 1157086 at *27 (employee's failure to contact an EEO counselor within 45 days of the date of the matter alleged to be discriminatory bars the employee from bringing a later court action based on that allegedly discriminatory conduct); Judge v. Henderson, 172 F.Supp.2d 410, 411, 413-414 (S.D.N.Y. 2001)(summary judgment dismissing claims of discrimination and of retaliation for not complying with EEO-counselor exhaustion requirement).

## 2. Basis for Liability

Beyond the question of plaintiff's failure to timely exhaust administrative remedies, the hostile work environment claim would still fail in the absence of a sufficient legal basis to impose liability upon the employer. Employers are not automatically liable for harassment perpetrated by their employees. See, Meritor Sav. Bank, 477 U.S. at 72 (examining concept). A plaintiff must satisfy "different standards for establishing employer liability in a hostile work environment case depending on whether the harasser is a supervisor or co-employee." Wilson v. Moulison North Corp., 639 F.3d 1, 7 (1st Cir. 2011). The employer is vicariously liable subject to an affirmative defense if the plaintiff's supervisor created the hostile work environment- Faragher, 524 U.S. at 807-808 (articulating formulation) – but where a coworker rather than a supervisor is responsible for creating a hostile work environment, the employer is liable if it is negligent, that is, "if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 261 (1st Cir. 2000)(discussing employer liability for co-employee harassment).

Actual notice of harassment is established by proof that management knew of the harassing incidents. See, Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002) (addressing topic). Constructive notice may be found where an employee provides management level personnel with enough information to raise a probability of harassment in the minds of a reasonable employer, or where the harassment is so severe and pervasive that under the facts of the case, "a reasonable employer would have had to be aware of it." Kunin v. Sears Roebuck and Co., 175 F.3d 289, 294 (3d Cir. 1999)(citing Zimmerman v. Cook County Sheriff's Dept., 96 F.3d

1017, 1018-1019 (7th Cir. 1996)).[35]  This standard strikes an appropriate balance between protecting the rights of the employee and the employer by faulting the employer for turning a blind eye to overt signs of harassment but not requiring it to attain a level of omniscience, in the absence of actual notice, about the misconduct.  Id.

Appropriate corrective action is action "reasonably calculated to end the harassment." Maldonado-González v. Puerto Rico Police, 110 F.Supp.3d 345, 352 (D.P.R. 2015). Reasonableness depends on elements such as whether the employer investigated the employee's complaint; the promptness with which it did so; and if a remedial measure was undertaken.  Id. Even if a remedial action does not effectively end the alleged harassment, however, it may still be legally adequate if "it was reasonably calculated to do so."  Bumbarger v. New Enterprise Stone and Lime Co., 170 F.Supp.3d 801, 838 (W.D.Pa. 2016).  Still, when the employer's response stops the harassment, there can be no employer liability under Title VII as a matter of law.  Id.

### a. Initial Harassment

Rivera was not plaintiff's supervisor. Within days of her complaint to Sánchez, management warned Rivera to refrain from inappropriate conduct (Docket No. 37, ¶ 13); placed him on a forced leave of absence (Docket No. 37, ¶ 17; Docket No. 44-1, p.1); and began an

---

[35] In Zimmerman, the Seventh Circuit (Posner, C.J.) observed that, "[t]he sheer pervasiveness of the harassment might support an inference that the employer must have known of it as might a complaint from someone other than the victim.  But when ... the only possible source of notice to the employer- in the absence of an Orwellian program of continuous surveillance, not yet required by the law -is the employee who is being harassed, she cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed."  96 F.3d at 1018-1019 (internal citations omitted).  See also, Sandoval v. American Bldg. Maintenance Industries, Inc., 578 F.3d 787, 802 (8th Cir. 2009)("An employer may be charged with constructive knowledge of previous sexual harassment … if the harassment was so broad in scope, and so permeated the workplace, that it must have come to the attention of someone authorized to do something about it").  The Kunin test coincides with the standard defining hostile work environment in that it uses the elements of severity and pervasiveness but differs from the hostile work environment standard in that it considers these elements together rather than in the disjunctive.  See, Nieves-Borges v. El Conquistador Partnership, L.P., S.E., 936 F.3d 1, 10 (1st Cir. 2019)(explaining that severity and pervasiveness are alternate criteria for evaluating whether a plaintiff has been subjected to a hostile or abusive work environment); Indest v. Freeman Decorating, Inc., 168 F.3d 795, 802 (5th Cir. 1999)(Weiner, J., specially concurring)(emphasizing the disjunctive "severe or pervasive").

investigation (Docket No. 37, ¶ 24; Docket No. 44-1, p. 1). Rivera returned to work three months later, on September 9, 2014: (1) pending a final agency decision; and (2) on the condition that he have no contact with plaintiff unless "absolutely necessary" (Docket No. 37, ¶ 39; Docket No. 44-1, p. 1). Subsequently, the USDA suspended Rivera without pay for five days in accordance with its Guide for Disciplinary Penalties (SUMF ¶ 51), informing him that: (1) his conduct was considered "a serious infraction;" (2) the suspension served to "correct [his] behavior;" and (3) future misconduct could lead to further disciplinary action "up to and including removal" (Docket No. 32-26, p. 3).

In context, the USDA promptly investigated plaintiff's allegations and took adequate remedial measures reasonably aimed at preventing any harassment. See, Wilson, 639 F.3d at 8 (company took appropriate remedial action as it immediately looked into plaintiff's complaint, concluded misconduct occurred, reprimanded harassers in "strong terms," and told them that repetition of misconduct would result in dismissal); Hollins v. Delta Airlines, 238 F.3d 1255, 1258 (10th Cir. 2001)(employer acted reasonably in that after plaintiff reported a coworker for having made a joke with racial overtones, employer acted immediately by taking written statements, reprimanding the coworker and sending him a warning letter which went on his employment record with the company). These measures foreclose liability for the reported incidents. See, Williams-Boldware v. Denton County, Tex., 741 F.3d 635, 642 (5th Cir. 2014)("Denton County took seriously Williams-Boldware's complaint and its remedial efforts effectively halted the racially harassing conduct of which she complained. Therefore, Denton County is entitled to judgment as a matter of law"); Spicer v. Com. of Va. Dept. of Corrections, 66 F.3d 705, 711 (4th Cir. 1995)("When presented with the existence of illegal conduct, employers can be required to respond promptly and effectively, but when an employer's remedial response results in the

cessation of the complained of conduct, liability must cease as well"); Bumbarger, 170 F.Supp.3d at 838 (similar).

### b. Subsequent Harassment

Plaintiff argues the USDA's remedial action was not reasonably calculated to prevent future harassment because after Rivera returned to work in September 2014 following his suspension, he allegedly harassed her again by "stalking and staring at her as to eat her with his eyes and even further sexually assaulted her on January 14, 2016" (Docket No. 44, p. 15), brushing her backside with his hand to take his jacket that was draped over a chair where she was sitting on. The allegations shed no light on whether the USDA's response was appropriate. An employer's disciplinary decision "must be evaluated in real time; it cannot be evaluated in hindsight." Wilson, 639 F.3d at 8. And based on the record, the USDA's actions matched the circumstances, promptly and effectively addressing the situation that plaintiff brought to the agency's attention.

Plaintiff first alerted the USDA as to Rivera's behavior when she approached Sánchez on May 24, 2014 to report the April 2014 breast-feeding incident, the two May 2014 ice cream related incidents, and the photo/inquiry incident (Docket No. 37, ¶¶ 10; 27). There is no evidence that plaintiff or other employees had previously complained about Rivera. During the investigation, Rivera was ordered to refrain from inappropriate conduct (Docket No. 37, ¶ 13) and from speaking to plaintiff unless absolutely necessary (Docket No. 37, ¶¶ 41; 17). In addition, the agency imposed disciplinary action in line with the recommended penalty range for a first offense involving sexual remarks, which could have included a Letter of Reprimand up to a 30-day suspension (Docket No. 32-26, p. 3). And it warned Rivera that future misconduct could lead to further disciplinary action, including termination (Docket No. 32-26, p. 6). Like in Wilson, where

the employer's response was considered appropriate, the USDA "did not mince words." <u>See</u>, 639 F.3d at 8.

In similar fashion, as already mentioned, after plaintiff complained about Rivera in May 2014 Rivera did not address plaintiff to speak about things other than work; did not offer her meals, ice cream, candy or drinks of any sort; did not make any comments to her about being with young people; and did not state to having an interest in, or wishing to see women expressing milk (Docket No. 44-3, p. 107 line 12 – p. 108 line 19). Further, plaintiff did not report any incident that could properly be described as a recurrence of the conduct she had complained about earlier (Docket No. 44-3, p. 60 line 19 – p. 61 line 7; p. 116 lines 2-18; p. 130 lines 10-15). A dividing line was thus drawn by the employer's intervention, separating such conduct from future incidents of alleged misconduct by Rivera.

Plaintiff's only contemporaneously reported concern was that Rivera was being allowed to be at the workplace (Docket No. 37, ¶¶ 42, 43, 44, 45, 46; Docket No. 44-1, p, 1; Docket No. 50, p. 3). In that regard, plaintiff reached out to Rosario on October 24, 2014, stating that Rivera "was not abiding by the contract" (Docket No. 37, ¶ 45-46; Docket No. 44-1, p. 1). But she did not return Rosario's email offering to set up a meeting to discuss her concerns (Docket No. 37, ¶ 47; Docket No. 44-1, p. 1), an omission preventing imposition of liability over the USDA's decision to reinstate Rivera and authorize him to work in the site. <u>See</u>, <u>Espinal</u> v. <u>National Grid NE Holdings 2, LLC</u>, 693 F.3d 31, 36-37 (1st Cir. 2012)(dismissing hostile work environment claim, as plaintiff did not provide details of objectionable incident even though the employer gave him the opportunity to do so); <u>Wilson</u>, 639 F.3d at 11 (dismissing subsequent harassment claim because contrary to what plaintiff was told, he did not report the harassment directly to the company's owner and chief executive).

Moreover, plaintiff never reported that Rivera was allegedly singing, whistling or staring at her, a fatal flaw in this case.[36] See, Fontánez-Nuñez v. Janssen Ortho LLC, 447 F.3d 50, 53-54, 57 (1st Cir. 2006)(dismissing hostile work environment claim of plaintiff who alleged to have been harassed from 1997 to 2001 but only complained to a manager in 1997 and did not thereafter made use of the company's complaint procedures); Green v. Franklin Nat. Bank of Minneapolis, 459 F.3d 903, 912 (8th Cir. 2006)(rejecting claim of harassment that allegedly occurred after plaintiff had complained of earlier instances of harassment in part because she never reported it to the employer, leading the court to observe that it "would be hard pressed to hold [the employer] … liable for conduct that was never reported"); McCrackin v. LabOne, Inc., 916 F.Supp. 1107, 1109 (D. Kan. 1996)(employer could not have remedied allegations of lewd and lascivious stares because plaintiff did not give it notice of them).[37]

Plaintiff's counsel wrote to the agency, but did not mention otherwise unreported incidents, and by that time, what had been reported to the employer had ceased more than one year earlier. In this way, on July 31, 2015, one of plaintiff's record attorneys wrote to Leyinska Wiscovitch, State Plan Health Director, APHIS, Puerto Rico and U.S. Virgin Islands, stating in part that Rivera retaliated against plaintiff "inasmuch as he attempts to be near [plaintiff] to intimidate her with a cavalier attitude that he can continue with his unlawful conduct and will not be disciplined" (Docket No. 44-4, Exhibit B, p. 2).[38] What the attorney referred to – that Rivera attempted to be

---

[36] Plaintiff did not report specific incidents other than those initially conveyed to her immediate supervisor on May 24, 2014, and her disagreement with management's decision to retain Rivera as an employee (Docket No. 37-26, p. 1).

[37] See also, Faragher, 524 U.S. at 807-808 (pointing out in context of hostile work environment created by a supervisor with immediate or successively higher authority over the plaintiff, that in the absence of tangible employment action a defending employer may raise as an affirmative defense to liability or damages the fact that, inter alia, the plaintiff employee failed to take advantage of employer-provided preventive or corrective opportunities).

[38] There is no evidence that Wiscovitch was with OCRDI or a contact person for EEO claims.

near plaintiff and acted with a bad attitude – was not, as will be discussed below, objectively hostile or abusive, severe or pervasive; at the time of the letter plaintiff had not contacted an EEO counselor and when she finally made contact, she only complained about the incidents she had complained about in May 2014. See, FAD (Docket No. 37, 27, p. 1).[39] But those incidents ceased when she reported them in May 2014 (Docket No. 44-3. P. 107 line 12 – p. 108 line 19).

On December 7, 2015, plaintiff contacted an EEO counselor. Some three weeks later, on December 31, 2015, the same attorney who wrote to Wiscovitch in July 2015, sent an email to Violet Hall, Assistant Secretary for Civil Rights, United States Department of Agriculture, Washington D.C. with a statement identical to the one he had sent on July 31, 2015 (Docket No. 44-6, p. 1). But in December 2015 plaintiff complained of the same incidents she had complained about in May 2014 (Docket No. 37-27, p. 1). However, as just noted, those incidents ceased when she reported them (Docket No. 44-3. P. 107 line 12 – p. 108 line 19).[40] Thus, neither the attorney's July 2015 letter nor December 2015 email gave the employer actual or constructive notice that Rivera was inappropriately singing, whistling or staring at plaintiff. See, Murray v. New York University College of Dentistry, 57 F.3d 243, 250-251 (2nd Cir. 1995)(dismissing complaint in part because record did not show that from information plaintiff provided to the defendant, it had actual or constructive notice of any sexually offensive staring); Miller, 277 F.3d at 1278 (asking a supervisor to tell coworker that he needed to watch what he said to plaintiff is not actual or constructive notice of harassment); Schiraldi v. AMPCO System Parking, 9 F.Supp.2d 213, 221

---

[39] Plaintiff also complained about the agency's decision to retain Rivera as an employee (Docket No. 37-27, p. 1). But as discussed below, in the circumstances of this case the agency's response need not have included Rivera's termination.

[40] Additionally, plaintiff also complained about the agency's decision to retain Rivera as an employee (Docket No. 37-27, p. 1). Nonetheless, as explained below, in the circumstances of this case the agency's response need not have included Rivera's termination.

(W.D.N.Y. 1998)(statement from one plaintiff to management that a coworker would not leave her alone and called her names, and from another plaintiff that the same coworker should be kept away from her because he was bothering her gave employer no indication that those plaintiffs were being sexually harassed); McCrackin, 916 F.Supp. at 1109 (no evidence that defendant knew of had constructive notice of supervisor's "lewd and lascivious" stares). In the absence of evidence, mere allegations "cannot support a finding that an employer knew or should have known of actual harassment in the workplace." E.E.O.C. v. CRST Van Expedited, Inc., 2009 WL 1033161, *4 (N.D. Iowa April 16, 2009).

On February 10, 2016, plaintiff emailed Eunice Everett about the jacket incident (Docket No. 50-5; ¶ 3), and on February 19, 2016, sent an email to Lauren Hill, with copy of the email on the jacket incident that she had sent to her supervisor (Docket No. 37-38, pp. 1-2). On February 22, 2016, Hill responded acknowledging receipt of the information, expressing that "as per last email communication" she had closed the informal EEO complaint and issued plaintiff a Notice of Right to File, and stating that the matter to which plaintiff's email referred should be addressed by plaintiff's supervisor(s) (Docket No. 37-38, p. 1). In turn, Eunice Everett referred the matter to José Jiménez, who contacted the employees that plaintiff had named as witnesses, as well as Rivera (Docket No. 37, ¶ 58). None of those employees, however, could corroborate plaintiff's account of the events (Docket No. 37, ¶ 58). Furthermore, Jiménez followed up directly with plaintiff, seeking clarification of her statement that Rivera pulled a jacket "brushing [her] buttocks, [her] low back and back" (Docket No. 50-5, ¶ 5).

In response, plaintiff delivered a revised statement stating that the jacket, rather than Rivera, brushed her buttocks lower back and back (Docket No. 50-5, ¶ 6), a clarification the employer was entitled to rely on. From the clarified description plaintiff gave of the jacket incident

and the two messages that her attorney sent to the USDA in July 2015 and December 2015, it was fair for the agency to consider Rivera ill-mannered or rude. <u>See</u>, <u>Wilson</u>, 639 F.3d at 8 (<u>citing Riggs</u> v. <u>AirTran Airways, Inc.</u>, 497 F.3d 1108, 1119 (10th Cir. 2007)(explaining that, in discrimination cases, courts should consider the facts as they appeared to the discriminator at the relevant time).[41] Yet "discourtesy or rudeness should not be confused with … harassment." <u>Faragher</u>, 524 U.S. at 787.

When an employee "complains about inappropriate conduct that does not rise to the level of a violation of law, there is no liability for a failure to respond." <u>Álvarez</u> v. <u>Des Moines Bolt Supply, Inc.</u>, 626 F.3d 410, 419 (8th Cir. 2010)(<u>citing in part</u> EEOC v. <u>Harbert-Yeargin, Inc.</u>, 266 F.3d 498, 521 (6th Cir. 2001)).[42] The evidence that plaintiff has offered falls short of showing actual knowledge or constructive notice of inappropriate singing, whistling or staring. From the record, to the extent those activities occurred, they were not so severe and pervasive that management should have been reasonably alerted that there was a problem that needed to be addressed under Title VII.

Plaintiff contends that the agency should have acted differently by permanently separating Rivera from the workplace.[43] Still, no reasonable jury could find that the USDA's actions constituted an inappropriate response to the information that plaintiff disclosed in connection with her allegations against Rivera. <u>See</u>, <u>Thirkield</u> v. <u>Neary & Hunter OB/GYN, LLC</u>, 76 F.Supp.3d

---

[41] Plaintiff stated that if Rivera had said to her, "Vizcarrondo, excuse me, but this jacket is mine," she would have stood up (Docket No. 44-3, p. 123, lines 17-20).

[42] <u>See also</u>, <u>Chaloult</u> v. <u>Interstate Brands Corp.</u>, 540 F.3d 64, 76 (1st Cir. 2008)(coworker did not hear several of the comments which plaintiff attributed to the supervisor, but believed the comments were not harassing and did not report them).

[43] Plaintiff stated that what moved her to file an EEO claim is the fact that Rivera was not permanently removed, and was allowed to go back to work (Docket No. 37-34, p. 40).

339, 348 (D. Mass. 2015)(employer's response appropriate where supervisors met with harasser and warned him against touching other employees, even though plaintiff witnessed him touch a co-worker a month later); <u>Caudillo</u> v. <u>Continental Bank/Bank of America Illinois</u>, 1998 WL 409406, at *1-*2, *5 (N.D.Ill. Jul. 16, 1998)(summary judgment dismissing hostile work environment and retaliation claims of plaintiff who complained of coworker harassment, which stopped after plaintiff reported it to the employer, and among other things, the employer investigated, instructing the coworker to: (i) avoid any contact with plaintiff that was not work-related; (ii) not speak to plaintiff unless required by his job responsibilities; and (iii) limit the amount of time he spent at work to that required to complete his jobs responsibilities; albeit thereafter the coworker followed plaintiff on various occasions and starred at her in what she described as an intimidating manner, the court found that the employer's response was reasonably calculated to prevent further harassment). Title VII "does not invariably require termination … as a response to harassment (even serious harassment)." <u>Wilson</u>, 639 F.3d at 8.[44] Because the employer's response was both timely and appropriate, it is not liable here. <u>See</u>, <u>Forrest</u> v. <u>Brinker Intern. Payroll Co., LP</u>, 511 F.3d 225, 226, 231-232 (1st Cir. 2007)(summary judgment dismissing hostile work environment action because employer took prompt and appropriate remedial actions to address the harassment of which the plaintiff complained); <u>Wilson</u>, 639 F.3d at 7-8 (same).

### 3. Rivera's Behavior

The USDA reasonably put in place adequate measures to address and prevent objectionable behavior. In fact, the initial harassment stopped following the employer's action. What is left is

---

[44] <u>See also</u>, <u>Frazer</u> v. <u>Temple University</u>, 25 F.Supp.3d 598, 614-615 (E.D. Pa. 2014)(no viable hostile education environment claim under Title IX of the Education Amendments of 1972 based on allegations that harasser was permitted to remain on campus, sat outside plaintiff's dorm building, followed her to the cafeteria, stood beside her and stared at her; the university held a disciplinary meeting within a month of plaintiff's complaint and suspended the harasser).

the behavior that, according to plaintiff, Rivera engaged in after his reinstatement.  But that behavior did not create a hostile work environment.  Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Koseiris v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003)(quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  While the conduct may be both severe and pervasive, "only one of the qualities must be proved in order to prevail."  Flood v. Bank of America Corp., 780 F.3d 1, 11 (1st Cir. 2015).  The severity may vary inversely with its pervasiveness.  Id. Nevertheless, the harassment must pass a certain threshold of severity.  Id.

To this end, whether an environment is hostile or abusive is determined by looking at the totality of circumstances, including the severity of the conduct, its frequency, the extent to which the behavior is physically threatening or humiliating as opposed to a mere offensive utterance, and the extent to which it unreasonably interferes with an employee's work performance.  See, Franchina, 881 F.3d at 46 (listing factors).  Applying this matrix, courts have distinguished between commonplace indignities and actionable harassment.  Offhand remarks, simple teasing, tepid jokes, and isolated incidents (unless extremely serious) are at one end of the continuum and are not actionable.  See, Faragher, 524 U.S. at 788 (discussing concept).  By contrast, "[s]evere or pervasive sexual remarks, innuendoes, ridicule and intimidation are at the other end of the continuum and may establish a hostile work environment."  Soto v. McHugh, 158 F.Supp.3d 34, 51 (D.P.R. 2016).

Against this backdrop, hostile work environment claims generally "do not turn on single acts but on an aggregation of hostile acts extending over a period of time."  Franchina, 881 F.3d at 47.  The actionable wrong "is the environment, not the individual acts that taken together, create

the environment." Ledbetter v. The Goodyear Tire & Rubber Co., 550 U.S. 618 (2007) *superseded by statute on other grounds*, Lily Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat. 5 (quoting Morgan, 536 U.S. at 115-116). Hostile conditions need not persist "for any particular bright line period of time before a hostile work environment claim will lie." Flood, 780 F.3d at 12, n.8. The point at which a work environment becomes hostile or abusive does not depend on any "mathematically precise test." Harris, 510 U.S. at 22. There is "no fixed number of incidents that a plaintiff must endure in order to show a hostile work environment." Alfano v. Costello, 294 F.3d 365, 379 (2nd Cir. 2002). Subject to some policing at the outer bounds, it is for the jury to weigh the relevant factors and decide whether the harassment "was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Marrero v. Goya of Puerto Rico, 304 F.3d 7, 19 (1st Cir. 2002). Although the inquiry is fact-specific, summary judgment is an appropriate vehicle for policing the baseline for hostile work environment. See, Rigau v. Pfizer Caribbean Corp., 525 F.Supp.2d 272, 283 (D.P.R. 2007) (applying formulation).

Plaintiff states that since Rivera returned to work from his suspension on September 9, 2014, he acted arrogantly, as if everything was casual and normal, by whistling, singing near her, and staring at her (Docket No. 37, ¶ 62; Docket No. 44-1, p. 1; Docket No. 44-3, pp. 106-108).[45] Also, she points to the jacket incident River was involved in on January 14, 2016 (Docket No. 44-3, p. 116). What plaintiff complains about was subjectively offensive to her, was not welcome,

---

[45] Responding to a question by USDA's counsel during her deposition, plaintiff stated that Rivera would come into her work area when he did not have to be there with an arrogant attitude, whistling and signing (Docket No. 44-3, p. 107, lines 4-11). Later in the deposition, her counsel asked her, "Okay, after [Rivera] return[ed] to work …how was his … demeanor, his behavior towards you" (Id. at page145 line 25 – page 146 line 5). She answered, "He would look at me, he would look me up and down, wanted to eat me with his eyes. When I'm going to get my purse and I look around, he is looking at me as if he wanted to eat me with his eyes." Id. at page 146, lines 6-10.

and, for summary judgment purposes, may be viewed as containing an element of gender-based animus.[46] Even so, the incidents are insufficient to sustain her claim as a matter of law.

Arrogance falls short of creating or materially contributing to an actionable hostile work environment. See, Patton v. Indianapolis Public School Bd., 276 F.3d 334, 339 (7th Cir. 2002)(arrogant behavior not actionable); Bush v. Johnson, 2015 WL 4522914, *5 (N.D. Tex. Jul. 27, 2015)(arrogance combined with conduct and statements that plaintiff found objectionable did not create a hostile work environment).[47] There is no evidence indicating why the singing or whistling plaintiff complains of may be considered objectively hostile. See, Medina-Rivera v. MVM, Inc., 713 F.3d 132, 138 (1st Cir. 2013)(rejecting sex discrimination claim in part because nothing plaintiff said indicated that the phone-call harassment was gender-based).

The jacket incident was isolated and mild in the context in which it took place. See, Rivera-Martínez v. Commonwealth of Puerto Rico, 2007 WL 16069, *3 (1st Cir. Jan. 4, 2007)(even though the inappropriate behavior in question involved unwanted physical touching, it was relatively limited given that on one occasion, the alleged harasser inappropriately touched plaintiff's forearm and in another instance, hastily pushed plaintiff out of his office, grabbing her back and shoulder and touching her hip, buttocks and brassiere area); Pérez v. Norwegian-American Hospital, Inc., 93 Fed.Appx. 910, 912 (7th Cir. 2004)(that coworker slapped plaintiff's buttocks with a notebook he was carrying not deemed objectively abusive).[48] And not every claim

---

[46] Harassing conduct "need not be motivated by sexual desire to support an inference of discrimination based on sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

[47] See also, McKenzie v. Milwaukee County, 381 F.3d 619, 624-625 (7th Cir. 2004)(standoffish behavior does not establish an objectively hostile work environment).

[48] See also, Morris v. City of Colorado Springs, 666 F.3d 654, 658, 665 (10th Cir. 2012)( that a surgeon hit plaintiff, a registered nurse, on the head twice in two weeks by flicking her with his finger without her permission not considered actionable harassment); Anderson v. Family Dollar Stores of Arkansas, Inc., 579 F.3d 858, 862 (8th Cir. 2009)(district manager's rubbing of plaintiff's shoulders or back at times during training session; calling plaintiff "baby doll" during a telephone conversation; accusing plaintiff

"premised on staring or leering in the work place automatically presents a question for the jury." Billings v. Town of Grafton, 515 F.3d 39, 50 (1st Cir. 2008). All "attendant circumstances" must be considered. Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st Cir. 2006). Evaluated in light of comparable cases, the circumstances here do not reflect a hostile work environment. Courts have declined to recognize as actionable, conduct more egregious- severe or pervasive - than that attributed to Rivera.

By way of example, in Wilkinson v. Potter, 236 Fed.Appx. 892, 893-894 (5th Cir. 2007), the Court of Appeals sustained the dismissal of a hostile work environment action based on evidence that a coworker stared at plaintiff for short, almost daily periods; made unnecessary appearances in plaintiff's work area; would follow plaintiff as she went to replace full mail bags with empty ones; in one instance did not back up to allow the plaintiff and her friend to pass and then touched plaintiff on her arm; and in one instance shook a rod in the plaintiff's direction for a few seconds.[49] Id. at 893. Otherwise, the coworker never attempted to speak with plaintiff. Id. The Court held that although some of the complained of conduct occurred frequently, the coworker's relatively mild acts were not so threatening or humiliating as to create a hostile work

---

[48] of not wanting to be one of his "girls;" suggesting that plaintiff should be in bed with him and a "Mai Tai" in Florida; and insinuating that plaintiff could go farther in the company if she got along with him, not severe, pervasive, or demeaning enough); Bowman v. Shawnee State University, 220 F.3d 456, 458-459, 463-464 (6th Cir. 2000)(that supervisor rubbed the employee's shoulder for approximately one to two seconds; put her finger on the employee's chest; placed her hand upon him, and pushed him toward the door, at which time he left the office; and at a party, grabbed the employee's buttocks, not sufficiently serious or pervasive); Swanson v. Northwestern Human Services, 2006 WL 3354145, *1, *3 (E.D.Pa. Nov. 30, 2006)(no hostile work environment where in a two-month period, on one occasion supervisor told employee that he looked good in jeans; on one occasion grabbed his buttocks; and asked him on dates). _Compare with_ Harvill v. Westward Commc'ns, L.L.C., 433 F.3d 428, 435-436 (5th Cir. 2005)(that over a seven-month period harasser grabbed plaintiff and kissed her on the cheek, popped rubber bands at her breasts and patted her on the buttocks numerous times, and once made comments about her sex life qualifies as sufficiently severe or pervasive).

[49] The District Court in the same case found that the plaintiff worked at the site where the incidents occurred between October 5, 2002 and May 20, 2002. See, Wilkinson v. Potter, 442 F.Supp.2d 304, 306, 310-311 (M.D. La. 2006)(specifying dates).

environment, and his actions should not have prevented plaintiff from succeeding in the workplace.

Id. at 894.

Likewise, in Mendoza v. Borden, Inc., 195 F.3d 1238, 1248-1249 (11th Cir. 1999)(en banc)

cert. denied 529 U.S. 1068 (2000), the Court of Appeals upheld a judgment as a matter of law

entered after plaintiff's case in chief during a trial in which plaintiff testified that in an 11-month

period the supervisor continually looked at her up and down; and on two instances made a sniffing

motion while staring at plaintiff's groin area. Id. at 1242-1243, 1251. Additionally, the supervisor

made one arguably offensive statement ("I'm getting fired up") and engaged in one inappropriate

physical contact (while plaintiff was at a fax machine in a hallway, he passed by her and rubbed

his right hip up against plaintiff's left hip while at the same time touching her shoulder and

smiling). Id at 1243, 1247. The Court ruled that these facts did not create a hostile or abusive

work environment. Id. at 1251.

Furthermore, in Valdry v. Brennan, 2017 WL 2702226, *2, *10 (M.D. La. June 6, 2017),

the Court rejected a hostile work environment claim based on testimony that between late 2013

and early 2015, a coworker gave plaintiff menacing looks when she returned to the station at the

end of the day after delivering mail; smirked at her; stuck his chest out, licking his lips; and made

four unprofessional comments, including one calling plaintiff "dumb dumb." Id. at *9. The Court

found the evidence insufficient to sustain the plaintiff's claim. Id. at *10.[50]

---

[50] See also, Gupta v. Florida Bd. of Regents, 2012 F.3d 571, 577-580, 585-586 (11th Cir. 2000) *overruled on other grounds by* White, 648 U.S. at 53 (dismissing hostile work environment claim of plaintiff who complained that during a period of six or seven months, a coworker, a fellow college professor, looked at her up and down when he first met her; later looked at her in a way that made her uncomfortable when she took off her jacket; once when she was wearing a skirt that was above her knee he stared at her legs, making her uncomfortable to the point that she never wore a short skirt again; he called her at her home two or three times a week late at night or over the weekends, asking if she was talking to her boyfriend, sometimes also asking if she was in bed; frequently asked her to have lunch with him; one day, when she was in the coworker's office discussing her teaching schedule, he rolled his chair, coming close to her and put his hand on her right thigh; on another day, she went into his office, and he suddenly rolled his chair towards her, saying "[w]hat kind of material is that?" lifting the hem of her dress about four inches with his hand; once he touched plaintiff's bracelet, saying "Oh, it is a very nice bracelet;" another time, he touched a ring plaintiff was wearing;

These scenarios may be placed alongside, and contrasted with, the one that the First Circuit considered in Billings, 515 F.3d at 39, where the circumstances revealed a hostile work environment. For one thing, during a period of two and a half years, plaintiff's supervisor regularly stared at plaintiff's breasts for approximately five seconds or what seemed like a long time. Id. at 41.[51] On one occasion the supervisor stared at the plaintiff so many times in the first half-hour of the workday that she went home to change out of the sweater she was wearing before returning. Id. On a separate occasion, the supervisor told a tax collector's clerk that plaintiff was under the desk where he was sitting when he was asked about plaintiff's whereabouts, a remark that the plaintiff found offensive. The supervisor acknowledged that his comment could have been taken to suggest that the plaintiff was under the desk performing oral sex even though he denied having meant it that way. Id.

Moreover, the plaintiff "repeatedly complained" to the employer, to no avail. See, Billings, 515 F.3d at 51 (citing the fact that on various occasions the plaintiff complained about the harasser's conduct in reversing dismissal of hostile environment claim). After the plaintiff complained, the staring decreased from a number of times each day to a couple of times a week but returned to its former frequency after a few weeks. Id. Furthermore, every time plaintiff needed to talk to the supervisor she had to make sure she was carrying something in front of her

---

one day he told plaintiff, "You are looking very beautiful;" one morning after a bad thunderstorm the night before, he called plaintiff and asked if she needed a ride to a university seminar, saying during the conversation, "Oh, you were all by yourself on a dark and stormy night? Why didn't you call me? I would have come and spend [sic] the night with you?; on one occasion, plaintiff entered the coworker's office on a day when the air conditioning was broken, it was very hot, the coworker was expecting plaintiff to pick up a book from his office, and when she entered the office discovered that the coworker had on his undershirt but had taken his dress shirt off, she offered to come back to see him later but he said to wait while he unbuckled his belt, pulled down his zipper and started tucking his dress shirt in; and once she came into plaintiff's office and asked her, "Why do you look so unhappy? Have you fallen for a man you can't talk about?"); Caudillo, 1998 WL 409406 at **2, *5 (that coworker followed plaintiff on various occasions and stared at her in "an intimidating" manner does not constitute actionable harassment).

[51] The supervisor made eye contact with plaintiff and then moved his eyes down to plaintiff's chest.

so that he would not look at her breasts and had to be careful with what she wore in the morning and with what she said. <u>Id.</u> (noting measures plaintiff had to take to get her work done). And other women who worked for the defendant also said the supervisor had subjected them to similar behavior, which they, too, found objectionable. <u>Id.</u> (observing that evidence of the harassment of third parties can help prove a legally cognizable claim of a hostile environment).

The staring that plaintiff alludes to here is not of the kind described in <u>Billings</u> she saw Rivera staring at her when she looked around to get her purse before leaving the area Rivera was at. Nor is there evidence of Rivera's staring at anybody else in that, or in any other manner. The conduct at issue did not objectively interfere with plaintiff's work. She was promoted (her pay grade increased), has been commended for good service, has received monetary awards for outstanding performance, and continues performing her duties in an excellent manner and to benefit from overtime. <u>See</u>, <u>Ayala-Sepúlveda</u> v. <u>Municipality of San Germán</u>, 671 F.3d 24, 31 (1st Cir. 2012)(dismissing hostile environment action in part because plaintiff presented almost no evidence to suggest that the alleged harassment unreasonably interfered with his work performance); <u>Bhatti</u> v. <u>Trustees of Boston University</u>, 659 F.3d 64, 74(1st Cir. 2011)(dismissing hostile work environment claim of plaintiff who failed to show the effect that the complained of conduct had on her work performance); <u>Pomales</u>, 447 F.3d at 83 (similar); <u>Rodríguez-Cruz</u> v. <u>Stewart Title Puerto Rico, Inc.</u>, 209 F.Supp.3d 427, 444 (D.P.R. 2016)(rejecting hostile work environment action in part because there was no evidence that emails in question caused any impediment to plaintiff's performance of her work duties).[52] Although the fact that a plaintiff

---

[52] Plaintiff claims to have lost the opportunity to write herself into the overtime-schedule book when Rivera puts himself down as an overtime volunteer, and that she gives Sunday shifts to other co-workers when she notices that Rivera will be in the same shift (Docket No. 37-34, p. 48). However, there is no evidence about the monetary aspect of the overtime or shifts that plaintiff alleges to have foregone. <u>See</u>, <u>Maldonado-Cátala</u> v. <u>Municipality of Naranjito</u>, 876 F.3d 1, 11, n.12 (1st Cir. 2017)(conclusory allegations lack the evidentiary quality necessary to create a genuine factual dispute); <u>Alvarado</u> v. <u>Donahue</u>, 687 F.3d 453, 460 (1st Cir. 2012)

manages "to get work done" despite harassment is not fatal to a hostile work environment claim,

Tuli v. Brigham & Women's Hospital, 656 F.3d 33, 40 (1st Cir. 2011), the circumstances do not

add up to a hostile work environment. The complained of conduct was not "detracting from

plaintiff's job performance" or "discouraging her from remaining on the job." Roy, 914 F.3d at

64.

Along the same line, the situation in the present case may be contrasted to the one the First

Circuit described in Nieves-Borges v. El Conquistador Partnership, L.P., S.E., 936 F.3d 1 (1st Cir.

2019), where hand touching, predatory staring in a cafeteria and invitations to the harasser's house

in 2014 contributed to a pattern of harassment going back 13 years, which included, on average,

two or three episodes every week in which the harasser would seek plaintiff out, examine with his

eyes plaintiff's physical body in a very sexual manner from up to down with repeated requests to

socialize after hours, and touched plaintiff "a gazillion times." Id. at 3-4, 8-10. See also, Rivera-

Rivera v. Medina & Medina, Inc., 898 F.3d 77, 93 (1st Cir. 2018)(plaintiff was subjected to a

hostile work environment, for she was taunted about her age nearly every single day for over two

years: she was called "vieja" (Spanish for old), and being so, told that she was "useless;" was

chastised for supposedly lacking the skills necessary to adequately fulfill the roles of her job

because age rendered her "slow;" was told that given her age, she should seek social security

benefits, with the suggestion that because she was perceived as being too old for the job, she should

resign before being forcibly discharged; and was yelled and screamed at); White, 221 F.3d at 260

(record showed a hostile work environment, as plaintiff's coworkers stared at women's breasts

---

(at summary judgment stage, plaintiff cannot rely on bare allegations but must point to specific facts properly asserted in affidavits and supporting materials which would permit a reasonable juror to find in her favor at trial).

and made sexual comments; and the disgusting comments, conversations about, and treatment of plaintiff were continuing and consistent, occurring every day); Cruz v. Coach Stores, 202 F.3d 560, 571 (2nd Cir. 2000)(plaintiff met her burden of demonstrating an atmosphere of sexual hostility pointing out that during daily trips to the mailroom between 1993 and either 1995 or 1996, supervisor made repeated remarks to the effect that women should be barefoot and pregnant, and would stand very close to women when talking to them, looking at them up and down in a way that made them very uncomfortable, and in plaintiff's case, if there was a wall plaintiff ended up against the wall).[53]  That is not what the record shows in the instant case.

An act of harassment "that is not actionable in and of itself may form part of a hostile work environment claim." Flood, 780 F.3d at 12.  A court, then, should not "disaggregate and separately analyze incidents that are alleged to constitute [the] hostile work environment." Gibson v. Verizon Services Organization, Inc., 498 Fed.Appx. 391, 394 (5th Cir. 2008).  However, it should undertake to "analyze the different categories of harassment that give rise to the hostile work environment claim." Fallon v. Potter, 277 Fed.Appx. 422, 427-428 (5th Cir. 2008).  And on balance, taking all of the cases referred to in this Section together as a rough template, the conduct

---

[53] In the same sense, see, Blackmon v. Eaton Corp., 587 Fed.Appx. 925, 927-928, 931 (6th Cir. 2014)(evidence of hostile work environment where during a ten-month period, plaintiff's supervisor stared at her breasts in a sexual manner between 3-10 time a week and often rubbed plaintiff's back, breathing on her neck when he approached her in plaintiff's work area); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 70, 75-76 (2nd Cir. 2001)(finding a triable issue inasmuch as for several months during plaintiff's tenure, her supervisor grabbed her hand daily or constantly, touching it every time plaintiff' tried to hand him a paper; touched plaintiff's hair "a lot;" made obscene leers at her; tried to peer down her blouse and up her skirt; and on approximately ten or twenty occasions made remarks insinuating that plaintiff "was involved with or had her eye" on married men), *abrogated on other grounds by* Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009); Matheny v. Reid Hosp. & Health Care Services, Inc., 2002 WL 655702, *7-*8 (S.D.Ind., March 12, 2002)(hostile work environment found where between November 1998 and August 1999, on approximately 20 to 30 occasions, coworker stared at plaintiff, which plaintiff described as looking her up and down at every inch of her body, which continued for several minutes, stopping only when plaintiff abandoned her work area or someone else entered the Department plaintiff was assigned to; at times coworker said things like he just wanted to look at plaintiff or to look at beautiful women; in November 1998 he placed his hands on the middle part of plaintiff's back and slid his hand down around her waist; and massaged her neck; on twelve occasions in January 1999, he unlocked the doors to plaintiff's department and spied on her; in July 1999; he attempted to touch plaintiff several other times but she was able to keep him away; twice he leaned his body over hers and pinned her into her chair by placing his arms on her desk; and made three other comments about plaintiff's appearance).

that plaintiff complains of does not reach the threshold required to sustain an actionable claim. Rivera's behavior crossed the boundary from professional to unprofessional but did not reach the level of abuse required for plaintiff to prevail. "[W]here a workplace objectively falls short of that 'abusive' high-water mark, it cannot sustain a hostile-work environment claim." Bhatti, 659 F.3d at 74.[54]

### ii.    Retaliatory Hostile Work Environment

Plaintiff alleges that she was retaliated against for having complained about Rivera (Docket No. 1, p. 3). She claims the USDA took adverse action against her by allowing Rivera to continue to be "near her so as to intimidate her" (Docket No. 1, p. 3). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in protected conduct; (2) her employer took a material adverse action against her; and, (3) a causal nexus exists between elements one and two. See, Medina-Rivera, 713 F.3d at 139 (discussing framework).

An employee has engaged in an activity protected by Title VII if she has either opposed any practice the statute makes unlawful or made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. See, Torres-Negrón v. Merck & Company, Inc., 488 F.3d 34, 44 (1st Cir. 2007)(stating proposition). Plaintiff engaged in protected activity by complaining to her immediate supervisor about the four incidents of April 2014 and May 2014 and later forwarding to an EEO counselor her account of the jacket incident. See, Pérez-Cordero v. Wal-Mart of Puerto Rico, Inc., 656 F.3d 19, 41 (1st Cir. 2011)(informal complaints and protests to management constitute protected activity); Pomales, 447 F.3d 79, 84(same).

---

[54] The Appendix includes a sampling of hostile work environment cases.

Following protected activity, employer actions sufficient to trigger Title VII's antiretaliation provisions involve "actions that would have been materially adverse to a reasonable employee," that is, actions that are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 57, 62. For the retaliatory action to be material, it must produce "a significant, not trivial harm," <u>Carmona-Rivera</u> v. <u>Puerto Rico</u>, 464 F.3d 14, 20 (1st Cir. 2006). It must be "more disruptive than a mere inconvenience." <u>Morales-Vallellanes</u>, 605 F.3d at 35.[55]

A retaliatory hostile work environment tolerated by the employer falls into this category, given that harassment by coworkers as a punishment for undertaking protected activity "is a paradigmatic example of adverse treatment spurred by retaliatory motives and, as such, is likely to deter the complaining party (or others) from engaging in protected activity." <u>Noviello</u> v. <u>City of Boston</u>, 398 F.3d 76, 90 (1st Cir. 2005)(recognizing action). This said, an allegedly retaliatory act "must rise to some level of substantiality before it can be actionable." <u>Noviello</u>, 398 F.3d at 92.

For that reason, the elements of the action overlap those necessary to succeed in a gender-based hostile work environment claim, except that to make a *prima facie* showing of a retaliation-based hostile work environment in violation of Title VII, "the gender-based requirements are replaced by the need to show a causal link between protected activity and the hostile work environment." <u>Maldonado-Catala</u>, 876 F.3d at 10, n.11. When the evidence can reasonably be viewed as addressing either discriminatory animus or retaliatory animus, the court may consider the same evidence in assessing the sufficiency of both of plaintiff's claims. <u>See</u>, <u>Pérez-Cordero</u>,

---

[55] This is "an objective test and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." <u>Morales-Vallellanes</u>, 605 F.3d at 36.

656 F.3d at 32 (so holding). And so, the court assumes for summary judgment purposes that Rivera's behavior was driven by retaliatory animus. But given that plaintiff supports the retaliatory work environment claim with the same evidence she relies on to support the gender-based claim, for the reasons discussed in connection with that claim there was no retaliatory hostile work environment here.

Finally, the retaliation claim would in any event fail for lack of causality. To establish causality, the plaintiff must show that the employer knew or should have known about the harassment yet failed to take prompt action to stop it. See, Noviello, 398 F.3d at 95 (articulating and applying standard). This element is critical, for it links the objected to work environment to the employer in the production of the adverse action for which redress is sought. But as discussed above, plaintiff did not report staring, singing, and whistling of any kind, and there is no evidence that the USDA knew or should have known of those incidents or allegations.

Plaintiff represented through her record counsel to the agency that Rivera had a cavalier attitude, and she herself reported the jacket incident, later clarifying that what touched her was the jacket, not Rivera's hand. Objectively viewed, however, these amounted to no more than petty slights, minor annoyances and simple lack of good manners, categories of conduct that the Supreme Court has placed beyond the realm of materially adverse actions necessary to prevail on a retaliation claim. As it held in White, 548 U.S. at 68-69:

> We speak of material adversity because we believe it is important to separate significant from trivial harms … The antiretaliation provision seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms … It does so by prohibiting employer actions that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers … And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

In consequence, there was no retaliatory hostile work environment that the USDA can be held liable for.  <u>Compare with</u> <u>Noviello</u>, 398 F.3d at 93-94 (finding retaliatory work environment where, among other things, plaintiff was subjected to steady stream of abuse over the course of several months, was falsely accused of misconduct, and suffered work sabotage).

### b.  Tort Claim

#### i.  Background

The Complaint asserts an Article 1802 claim against Rivera out of the jacket incident, which plaintiff characterizes as an "assault" (Docket No. 1, ¶ 59; Docket No. 44, pp. 20-21).  In her view, Rivera assaulted her by removing his jacket from the chair she sat on, in the process of which, while grabbing and pulling the jacket from the chair, he touched plaintiff's back and buttocks (Docket No. 32-28, p. 2).  Defendants argue that, under the FTCA, plaintiff's exclusive remedy is against the United States such that Rivera cannot be sued *eo nominee* for tortious conduct while in the discharge of his official duties (Docket No. 36-1, p. 22).

#### ii.  TCA

The FTCA waives the United States' sovereign immunity with respect to certain, but not all, types of tort actions.  <u>See</u>, <u>Simone</u> v. <u>United States</u>, 579 F.3d 79, 88 (discussing topic).  Where applicable, the waiver "is effective only for the acts or omissions of a federal employee within the scope of his employment."  <u>Merlonghi</u> v. <u>United States</u>, 620 U.S. 50, 54 (1st Cir. 2010).[56]  Before 1988, a plaintiff with a tort claim against a federal employee could proceed against the employee in his personal capacity, and if the employee was acting within the scope of his office or

---

[56] Pursuant to 28 U.S.C. § 1346(b)(1), district courts have jurisdiction over tort claims against the United States "for personal injury … caused by the negligent or wrongful act or omission of any employee … while acting within the scope of his office or employment, under circumstances where the United States … would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

employment, could proceed against the United States instead of or in addition to the federal employee under the FTCA, 28 U.S.C. §§ 1346, 2671-2678, 2680. See, Aversa v. United States, 99 F.3d 1200, 1207 (1st Cir. 1996)(discussing topic). In 1988, Congress amended the FTCA "to reinforce federal employees' individual immunity from tort actions with the Federal Employees Liability Reform and Tort Compensation Act of 1988." Davric Main Corp. v. U.S. Postal Service, 238 F.3d 58, 65 (1st Cir. 2001). The amendments, "commonly known as the "Westfall Act" because they were a response to Westfall v. Erwin, 484 U.S. 292 (1988), "afford federal employees who allegedly commit a common law tort absolute immunity where they were acting within the scope of employment, but allow the suit to proceed against the federal government unless some exception to the FTCA applies." Davric, 238 F.3d at 65.[57]

### iii. Westfall Act

The "heart of the scheme created by the Westfall Act lies in Sections 5 and 6." Nasuti, 906 F.2d at 804. Section 5 provides that "the FTCA's remedy against the United States for the negligent or wrongful acts or omission of any government employee while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages … against the employee whose act or omission gave rise to the claim …" Id. (quoting 28 U.S.C. § 2679(b)(1)). In turn, Section 6 implements Section 5's exclusive-remedy provision, directing

---

[57] In Westfall, the Supreme Court reduced the immunity previously available to federal employees for common law torts committed within the scope of employment. See, Nasuti v. Scannell, 906 F.2d 802, 804 (1st Cir. 1990)(so explaining)(Osborn v. Haley, 549 U.S. 225, 237, 243 (2007) abrogated Nasuti on the issue of remand following rejection of certification but not on the propositions for which the case is being cited in this Opinion and Order). At the same time, the Supreme Court in Westfall invited Congress to deal with the immunity issue, stating that "Congress is in the best position to provide guidance for the complex and often highly empirical inquiry into whether absolute immunity [for federal employees] is warranted in a particular context." Westfall, 484 U.S. at 300. And Congress quickly accepted the invitation, "enacting the Westfall Act within the year." Nasuti, 906 F.3d at 804. Thus, in findings set out at the beginning of the Act, Congress denounced judicial "erosion of immunity of Federal employees from common law tort liability," pointing out that such erosion "created an immediate crisis involving the prospect of personal liability and the threat of protracted personal tort litigation for the entire Federal workforce." Id. (quoting Pub. L. No. 100-94, § 2(a)(5), effective November 18, 1988).

the "Attorney General to defend any civil action or proceeding brought in any court against an employee of the government for damage or injury." Nasuti, 906 F.2d at 804 (citing 28 U.S.C. § 2679(C)).

Toward this end, Section 6 authorizes the Attorney General to issue what has come to be called a "scope certification," a certification that "the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose ..." Nasuti, 906 F.2d at 804 (quoting 28 U.S.C. § 2679(d)(1)-(2)). Whether a federal employee was acting within the scope of his employment for purposes of the FTCA is subject to the law of respondeat superior of the state in which the negligent or wrongful conduct occurred. See, Olivera-Pagán v. Manati Medical Center, Inc., 139 F.Supp.3d 530, 535 (D.P.R. 2016)(so recognizing) (citing in part Aversa, 99 F.3d at 1208-1209). That state here is Puerto Rico.[58]

Once certification is made, the United States is substituted as party defendant. See, Davric, 238 F.3d at 65 (describing substitution mechanism). By Regulation, the Attorney General has delegated this authority to United States Attorneys, who make scope certification determinations in consultation with the Department of Justice. See, 28 C.F.R. § 15.3 (1997). The Attorney General's authority is set forth in 28 U.S.C. § 510. While certification is sufficient to substitute the United States as defendant and dismiss the federal employee from the case, it is "provisional and subject to judicial review." Vélez-Díaz v. Vega-Irizarry, 421 F.3d 71, 76 (1st Cir. 2005). Upon a showing that the employee was acting outside the scope of employment as determined by the applicable state law, "that employee may be re-substituted." Davric 238 F.3d at 65.

---

[58] It might be surprising that the federal statutory immunity of a federal employee to suit for official acts should turn on state law, "[b]ut the choice was deliberate." Lyons v. Brown, 158 F.3d 605, 609 n.3 (1st Cir. 1998). It was based upon the earlier decision in adopting the FTCA to rely upon state law to establish employer responsibility from the conduct in question. Id.

Should the Attorney General or the United States Attorney fail to certify that the employee acted within the scope of employment, the employee may also file a petition to challenge this decision. <u>See</u>, 28 U.S.C. § 2679(d)(3)(addressing issue). In the event a plaintiff asserts that a defendant acted outside of his employment despite the Attorney General's certification to the contrary, "the burden of proof is on the plaintiff." <u>Davric</u>, 238 F.3d at 66. At the time the district court reviews the Attorney General's certification, "the plaintiff has no right to a jury trial." <u>Osborn</u>, 549 U.S. at 252.

### iv. Exhaustion

Unlike a suit against a private person, to pursue an FTCA claim "the Congress has created an administrative procedure that claimants must follow and exhaust." <u>Santiago-Ramírez</u> v. <u>Secretary of Dept. of Defense</u>, 984 F.2d 16, 18 (1st Cir. 1993). On that basis, Section 2401 provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).

Likewise, Section 2675 states that "[a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."

A Department of Justice Regulation fleshes out portions of this requirement, providing in part that, "a claim shall be deemed to have been presented when a Federal agency receives from a

clamant, his duly authorized agent or legal representative, an executed Standard Form 95 or other written notification of an incident, accompanied by a claim for money damages in a sum certain for injury to or loss of property, personal injury, or death alleged to have occurred by reason of the incident …" 28 C.F.R. § 14.2(a).

### v. **Substitution**

The "limitations and exceptions of the FTCA apply to an action after the United States substitutes itself for the individual defendants." <u>Román</u> v. <u>Townsend</u>, 224 F.3d 24, 28 (1st Cir. 2000). If the United States is found to be immune from liability due to the limitations or exceptions of the FTCA, the substitution of the United States as the sole defendant is not thereby undone nor may the individual employee be brought back into the lawsuit. <u>See</u>, Gregory C. Sisk, *Litigation with the Federal Government*, West Academic Publishing (2016), p. 368 (discussing issue in light of <u>Gutierrez de Martínez</u> v. <u>Lamagno</u>, 515 U.S. 417, 420 (1995) and <u>United States</u> v. <u>Smith</u>, 499 U.S. 160, 161-162 (1991)). However, if the United States is substituted as the party defendant and the action is dismissed for failure to present an administrative claim under the FTCA, the plaintiff then may file an administrative claim, which will be deemed timely filed if (1) the administrative claim "would have been timely had it been filed on the date the underlying civil action was commenced," that is, if the underlying lawsuit against the government employee had been filed within two years of the accrual of the tort cause of action, and (2) "the claim is presented to the appropriate Federal agency within 60 days of the civil action." 28 U.S.C. § 2679(d)(5).

### vi. **Disposition**

The USDA argues that "by their own nature, the allegations asserted within the Complaint charge Rivera with engaging in negligent and/or tortious acts while performing his duties as a [PPQT] for APHIS" (Docket No. 36-1, p. 22). Rivera's removing a jacket in the process of

preparing to leave his overtime shift in the work site from a chair plaintiff was sitting on is not necessarily synonymous with performing his duties, but may have occurred within the scope of his employment (an issue the court does not address at this point). However, the United States Attorney does not seem to have filed a certification that Rivera was acting within scope of employment; and there is no indication that Rivera challenged that decision. Additionally, the record is unclear on whether plaintiff exhausted administrative remedies under the FTCA.

## IV.     CONCLUSION

Plaintiff's hostile work environment action fails at various levels: non-exhaustion; prompt and adequate employer response to the incidents plaintiff complained about in May 2014; employer's lack of knowledge- actual or constructive -about incidents that plaintiff attributes to Rivera after he was reinstated in September 2014;[59] and ultimately, accepting that those latter incidents occurred, they do not rise to the level of severity or pervasiveness that the law requires for a showing of a hostile work environment. Title VII is demanding. It is not a general civility code. Rivera's conduct was improper, but not actionable. With that in mind, the USDA's Motion for Summary Judgment (Docket No. 36) was GRANTED as to plaintiff's Title VII claims. The tort claim requires further briefing. Accordingly:

1. Not later than **April 20, 2020**, the USDA shall inform whether a scope certification regarding the jacket incident was or has been issued and if so, shall file the certification in court.

---

[59] Plaintiff gave notice of the jacket incident, but for the reasons discussed in the text, it does not result in liability here.

2. If no scope certification has been and will not be issued, Rivera shall inform the court by **April 27, 2020** of whether he will challenge that decision, and if so, challenge the decision by that date.

3. If a scope certification is filed or Rivera challenged the Attorney General's decision not to issue the certification– unless plaintiff agrees that Rivera acted *within* the scope of his employment at the time of the jacket incident – by **May 11, 2020**, she shall brief the court on whether at the time of the incident, Rivera was acting *outside* the scope of his employment.

4. By **May 18, 2020**, the parties shall brief the court on whether, assuming Rivera was acting *within* the scope of his employment, plaintiff complied with the FTCA's requirement of filing an administrative claim for damages arising out of the jacket incident, and if not, what the appropriate disposition should be.

5. The parties may respond to the other parties' briefs on scope of employment and exhaustion, within **ten business days** of the filing of the brief that they are responding to.

6. In the event there is a dispute as to whether Rivera was acting within the scope of his employment at the time of the jacket incident, the court will schedule a hearing to receive evidence on the matter.

**SO ORDERED.**

In San Juan, Puerto Rico, this 20th day of March, 2020.

s/Pedro A. Delgado Hernández
PEDRO A. DELGADO HERNÁNDEZ
United States District Judge

# V.      APPENDIX

## (Sampling of Hostile Work Environment Cases)

### a.  No Hostile Work Environment

Pomales v. Celulares Telefónica, 447 F.3d 79, 81, 83-84 (1st Cir. 2006)(supervisor's grabbing his crotch in plaintiff's presence and stating that "it would be great to come with you," insufficient to create a hostile work environment);

Morgan v. Mass Gen. Hosp., 901 F.2d 186, 192-93 (1st Cir. 1990)(conduct not sufficiently severe or pervasive where, over a two-week period, a coworker purposely stood behind plaintiff so as to bump into him; "peeped" at plaintiff's genitals while standing next to him at the bathroom; "hung around him a lot;" and asked him to dance at a holiday party);

Paul v. Grumman, 309 Fed.Appx, 825, 826, 829 (5th Cir.2009)(that foreman walked up to plaintiff until his chest was touching hers, thus "chesting up" to her breasts; as plaintiff attempted to separate herself, foreman stated at her in an intimidating manner; when plaintiff walked away toward a narrow passageway, foreman followed her and forced his way through the door ahead of her, placing his hand on her stomach and running his arm around her waist; and as he squeezed past her in the passageway, he rubbed his pelvic region across her hips and buttocks, not sufficient to support hostile work environment claim);

Webb-Edwards v. Orange County Sheriff's Office, 525 F.3d 1013, 1016-1017, 1026-1028 (11th Cir. 2008)(that at least once a week for eight weeks supervisor told plaintiff that she looked hot, should wear tighter clothes, and he wished his wife wore tight clothes did not amount to actionable harassment);

Duncan v. General Motors Corp., 300 F.3d 928, 931, 933-934 (8th Cir. 2002)(no hostile work environment found where, from August 1994 to May 1997, supervisor touched plaintiff's hand on four or five occasions; told plaintiff to make a sketch of a planter shaped like a slouched man with a hole in the front of his pants allowing for a cactus to protrude; showed plaintiff a penis-shaped pacifier which coworker kept in his desk; expressed to plaintiff that he wanted to have a relationship with her; asked her to type a draft of the "He-Men Women Hater's Club," whose beliefs included repeal of the 19th Amendment, that women have coodies and they can spread, sperm have a right to live, all great chefs are men, and prostitution should be legalized; directed plaintiff to create a training document for him on  his computer, which had as a screen saver a picture of a naked woman; and told plaintiff to prove her artistic ability by drawing his planter in order to be considered for an illustrator's position even though  previous applicants were required to draw automotive parts);

Sprague v. Thorn, Americans, Inc., 129 F.3d 1355, 1366 (10th Cir. 1997)(that over a span of 16 months coworker once told plaintiff "you really need to undo that top button;" on one occasion "brought up the subject about women and PMS" stating "you know how they are at that time of the month;" on plaintiff's wedding reception, he put an arm around plaintiff and looking down her

dress said, "well, you got to get it when you can;" and on another occasion while discussing what to call "neck chains" plaintiff said "neck chains," to which the supervisor replied "neck chains! That sounds kind of kinky," held insufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive work environment);

Black v. Zaring Homes, Inc., 104 F.3d 822, 823-824 (6th Cir. 1997)(that between July and November, during a meeting a coworker reached over to take a pastry from a plate in the center of the table in front of plaintiff and said "nothing I like more in the morning than sticking buns" while looking plaintiff up and down, smiling, and wriggling his eyebrows; in a meeting plaintiff attended where participants discussed a parcel of land adjacent to a Hooter's Restaurant, someone suggested that the area be named "Hootersville" and other coworkers suggested "Titsville" or "Twin Peaks" while coworkers laughed, further making jokes about this particular parcel of land at "numerous meetings;" during a meeting plaintiff gave a presentation regarding a parcel of land owned by an individual named "Dr. Busam, apparently pronounced "bosom," and when she mentioned the owner's name, coworkers began joking again about possible names for the property near the Hooter's Restaurant; and during a meeting, when plaintiff asked about the location of a particular property, a coworkers told her it was near a biker bar, and another coworker said "Say, weren't you there Saturday night dancing on the tables?" and everybody laughed, considered insufficient to create an objectively hostile work environment);

Baskerville v. Culligan Internat'l Co., 50 F.3d 428, 430 (7th Cir. 1995)(over a period of seven months, plaintiff's supervisor called her "pretty girl;" once made a grunting sound when she was wearing a leather skirt; when an announcement "May I have your attention, please" was broadcasted over the public address system, he said to her, "You know what that means, don't you, all pretty girls run around naked;" and once made a movement suggesting masturbation in response to plaintiff's question regarding whether he had bought his wife a Valentine's Day card. The court found that the incidents could not reasonably be thought to constitute actionable sexual harassment under Title VII).

### b. **Hostile Work Environment**

Roy v. Correct Care Solutions, 914 F.3d 52, 57-64 (1st Cir. 2019)(jury issue on whether plaintiff's work environment was discriminatorily hostile: in late 2012, a corrections officer (Snow) assigned to the clinic where plaintiff worked as a nurse, constantly made sexual jokes and degrading comments about women to plaintiff, and made physical contact with her on two occasions, once squeezing and twisting her wrist until she dropped to her knees in pain, and once benting her over a chair and spanking her; in the spring of 2014 a second officer (Turner) constantly made derogatory comments about women, left plaintiff alone in exam rooms with inmates, and did not respond to her requests to bring sick or injured inmates to the clinic; when plaintiff filed an incident report about him and his behavior around plaintiff, the behavior escalated; that summer, a third officer (Parrow) sent plaintiff several sexually explicit messages, and texted her that she was being a shit after plaintiff refused to share with him medical information that he wanted about an inmate even though by statute the information was confidential and Parrow was not authorized to receive it, whereas other officers also requested confidential information and responded to plaintiff's refusal to share it by calling her names, yelling, hanging up on her, and threatening to file

grievances against her; by mid-August, multiple officers showed daily hostility toward plaintiff, and filed reports complaining about her; on September 12, a fourth officer (Doyle) told plaintiff that an inmate needed to get sick so that the ensuing medical call would get plaintiff off her fat lazy ass; the same week, plaintiff was told that a fifth officer (Dever) had said that plaintiff had fucked everyone in the prison; plaintiff reported the incidents, the deputy warden said he was frustrated that plaintiff was involved in so many investigations, and that he wanted to revoke plaintiff's security clearance; the clearance was revoked and plaintiff's employment terminated);

Tang v. Citizens Bank, 821 F.3d 206, 217-218 (1st Cir. 2016)(jury issue on hostile work environment, as plaintiff's supervisor visited plaintiff's office frequently, and made inappropriate comments to her every time he had the chance to do so; he referred to Thai "au pairs" and revealing swimwear, suggested that plaintiff combine her "ass" with his,' asked questions about where plaintiff found men and dating websites; in addition, he leered at her, gestured to plaintiff's "private area," made obscene coupling indications with his hands, and would get physically close to plaintiff, becoming "very excited" as he drew closer to her) .

Vera, v. McHugh, 622 F.3d 17, 27 (1st Cir. 2010)(for multiple hours every day for three months supervisor stared at plaintiff up and down in a sexual way; came so close to her that she could feel his breath; pulled his chair next to plaintiff so that their legs touched; laughed at plaintiff's discomfort, blocked plaintiff's escape from the cramped office with a close door, and on one occasion, called plaintiff "Babe");

Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19-20 (1st Cir. 2002)(supervisor constantly referred to plaintiff as "the redhead;" frequently made comments such as "the redhead is really hot," "the redhead is on fire," and "if this is what hell is like then the devil can take me with him;" made repeated comments about plaintiff's lips, legs and clothing; once asked plaintiff what she was going to do with the thing that she had between her legs; on another occasion invited a male employee to assess what sort of underwear plaintiff was wearing under her skirt; one October 31st told plaintiff, giving her a direct and penetrating look with lust, that he was going out to buy Halloween presents and he had a little present for her that she was never going to forget and if she did not do the things he told her and order her to do, he was going to fire her; on approximately five occasions he made full "body to body" contact with plaintiff in the hallway; at other times, he would stand in plaintiff's way and when she tried to pass him, pretend they were dancing; when plaintiff used the photocopier machine, he often hovered over her with hands on her shoulders or stood close by, rubbing the side of his body against her);

Crowley v. L.L Bean, Inc., 303 F.3d 397 (1st Cir. 2002)(co-worker grabbed plaintiff's foot and massaged it against her will at a company pool party; told her that she was the perfect woman and that she had perfect women's feet; gave plaintiff gifts intended to let her know that he was watching her both at and outside of work; followed her home one evening by turning off his headlights and pursuing her car in the dark; at a company party repeated that plaintiff was the perfect woman and pinpointed the exact location of her house on a map, letting her know that he knew exactly where she lived; followed plaintiff at work, sometimes lurking in the dark outside the women's bathroom while waiting for her to emerge; often parked next to plaintiff's car in the parking lot, following her to her car when she left work; used the company's computer units to track plaintiff's movement

within the warehouse where she worked; frequently blocked plaintiff in the aisles, forcing her to squeeze by him; broke into plaintiff's house while she was there, tried to get her to touch his clothing, and grabbed her wrists in an attempt to bring her upstairs with him, telling that he wanted to date her, admitting that he had been at her house previously, describing what outfits she had been wearing on those occasions, and after he finally left, plaintiff saw him outside peering in different windows of her house, leading plaintiff to hid in the bathroom until he left);

Hernández-Loring v. Universidad Metropolitana, 233 F.3d 49, 49-50, 52-53 (1st Cir. 2000)(triable issue as to hostile work environment where head of university's academic committee made advances to plaintiff (an associate professor), repeatedly asking her for dates, which she rebuffed; interrupted her classes to request dates with her; used sexually explicit and suggestive language toward plaintiff; interrupted her class to do so; boasted to her that he had caused her denial of promotion because he had spurned him ("Maria Virginia, this happened to you for being such a bitch … and for not being willing to go out with me"); and during a faculty meeting the chancellor pawed plaintiff and lasciviously addressed her);

Hulsey v. Pride Restaurants, 367 F.3d 1238, 1241-1242, 1248 (11th Cir. 2004)(hostile work environment found where plaintiff's supervisor frequently tried to get plaintiff to date him using direct as well as indirect propositions for sex; followed plaintiff into the bathroom; engaged in repeated attempts to touch her breasts, place his hands down her pants and pull off her pants, and enlisted the assistance of others in the workplace to hold plaintiff while he attempted to grope her);

Hutchinson v. Amateur Electric Supply, Inc., 42 F.3d 1037, 1041-1043 (7th Cir. 1999)(owner and president of employing company regularly quizzed female employees about the nature and frequency of their sexual relations; engaged in numerous sexually explicit telephone conversations with his brother leaving his office door open to ensure that plaintiff and the other primarily female office workers would overhear his salacious comments; told plaintiff that another employee, whom he referred to as "Ms. Boobs," did not have to work and that he kept her on staff strictly because of her looks; said that once the company moved to new headquarters, it would buy sexy outfits to wear; commented regularly on plaintiff's appearance, telling her "I like the way you look today" while looking her up and down; frequently attempted physical contact with plaintiff and other female employees, several times a week approaching plaintiff at her desk, brushing against her, pinning her in, and saying in response to her inquiry," I am just watching you");

Steiner v. Showboat Operating Co., 25 F.3d 1459, 1461-1462 (9th Cir. 1994)(plaintiff's supervisor called her (a casino floor-person) "dumb fucking broad," "cunt," and "fucking cunt;" one day upon learning that plaintiff had "comped" a breakfast for two men who had been playing Blackjack at her table, confronted her in front of customers and other employees stating, among other things, "Why don't you go in the restaurant and suck their dicks while you are at it if you want to comp them so badly?" and showed up for work early, as plaintiff was finishing her shift, making "stares, glares, snickers, and comments");

Soto v. McHugh, 158 F.Supp.3d 34, 51 (D.P.R. 2016)(co-worker continually made sexual comments to plaintiff; sent inappropriate e-mails, and asked her out multiple times after she refused; he asked her out to dinner, to meet at a hotel, and inquired about the things she liked in

men; he would constantly call her names such as "gamberra" and "nena," used inappropriate language like "orgasmic" and sent her emails with sexually suggestive pictures suggesting that in order to get promoted a female had to give good blow jobs; and on one of the emails he asked plaintiff if she had "fucked" her supervisor);

Figueroa García v. Lilly del Caribe, Inc., 490 F.Supp.2d 193, 200-202 (D.P.R. 2007)(coworker told plaintiff in front of a supplier that she was good enough to eat; inquired if she was a member of the New Progressive Party ("NPP") and when plaintiff asked why, coworker responded by analogizing plaintiff's female genitalia to the NPP's palm branch insignia; he told her that the brassiere she was wearing looked good on her and commented that it was not the same one she wore the previous week; repeatedly told plaintiff how good she looked in jeans, especially while doing exercises; commented on her underwear and the size of her waist; said that plaintiff was enough woman to satisfy him and the entire warehouse where they both worked; on many occasions he would lick and smack his lips at plaintiff; made movements with his tongue and noise with his mouth referring to plaintiff; insisted on kissing plaintiff every morning although she requested that he not do so; and invited plaintiff to a hotel, whereas another coworker told plaintiff that he would marry an older woman like her, one who looked like a 20-year old, plaintiff stated that she could be the coworker's mother, to which he responded by using the term "mama" in a sexually suggestive manner - the Spanish word "mama" translates to "mommy" or "mother" in the English language, but the Spanish verb "mamar" translates as "to suck" – he told plaintiff that her G-string lingerie looked good on her; during an exercise session he told plaintiff "imagine me waiting for you with my penis erected while you do squats;" and he inappropriately touched plaintiff when he rubbed his erect penis against her buttocks, and when plaintiff pushed him away, the coworker responded by telling plaintiff that she had a desirable body).