**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

<table>
<tr><td>

**ANA VIZCARRONDO-GONZÁLEZ,**

    **Plaintiff,**

      **v.**

**SONNY PERDUE, SECRETARY
UNITED STATES DEPARTMENT
OF AGRICULTURE (USDA), et al.,**

    **Defendants.**

</td><td>

**CIVIL NO. 16-2461 (PAD)**

</td></tr>
</table>

**OPINION AND ORDER**

Delgado-Hernández, District Judge.

Plaintiff Ana Vizcarrondo-González sued the U.S. Department of Agriculture, the Secretary of Agriculture, Thomas Vilsack, and Eliud Rivera, a co-worker, under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., the U.S. Constitution and Puerto Rico law, including Puerto Rico's general tort statute, Article 1802 of the Civil Code, P.R. Laws Ann. tit. 31 § 5141. See, Docket No. 1.[1] All claims except the tort claim against Mr. Rivera were dismissed in previous stages of the litigation. See, Docket Nos. 20, 28, 63. For the reasons explained below, the remaining claim is DISMISSED.

## I.   INTRODUCTION

On April 16, 2020, the Government presented a scope of employment certification with respect to the tort claim, and asked to substitute the United States for Mr. Rivera (Docket No. 65). Ms. Vizcarrondo challenged the certification (Docket No. 66). The Government and Mr. Rivera

---

[1] The other local provisions invoked were Law No. 17 of April 22, 1988, P.R. Laws Ann. tit. 29 § 155; Law No. 69 of July 6, 1985, P.R. Laws Ann. tit. 29, § 1321; Law No. 115 of December 20, 1991, P.R. Laws Ann. tit. 29 § 194, and Sections 1, 8 and 16 of Article II of Puerto Rico's Constitution, P.R. Laws Ann, tit. 1 (Docket No. 1, p. 2 at ¶ 7).

replied to the challenge (Docket Nos. 67 and 68).  The court authorized limited discovery as to the

certification (Docket No. 77), and on October 8, 2020, held an evidentiary hearing (Docket Nos.

81 and 85).  In light of the evidence presented at the hearing, the court concludes that Mr. Rivera

was acting within the scope of his employment at the time of the incident on which the tort claim

is based.  As such, he is substituted by the United States.[2]  But given that Ms. Vizcarrondo

complains of assault and battery, the Government has not consented to be sued for intentional torts

except in limited instances not present here, and Ms. Vizcarrondo failed to exhaust administrative

remedies under the Federal Tort Claims Act ("FTCA"), the tort claim must be dismissed.

## II.  FACTUAL BACKGROUND

Ms. Vizcarrondo alleges that on January 14, 2016, while she was waiting to start her shift

in Terminal A of the Luis Muñoz Marín International Airport in Puerto Rico, Mr. Rivera

approached her and snatched his jacket from the chair she was sitting on, inappropriately touching

her back, low back, and buttocks (Docket No. 1, ¶ 59).  Ms. Vizcarrondo and Mr. Rivera are

employees of the United States Department of Agriculture's Animal and Plant Health Inspection

Service ("APHIS"), assigned to the International Airport (Docket No. 63, pp. 3-4).[3]  On the day of

the incident, Ms. Vizcarrondo was a GS-7 Plant Protection and Quarantine Officer ("PPQO"),

whereas Mr. Rivera was a GS-5 Plant Protection and Quarantine Technician ("PPQT") (Docket

---

[2] Strictly speaking, the court should have substituted the United States "upon certification."  Vélez-Díaz v. Vega-Irizarry, 421 F.3d 71, 76 (1st Cir. 2005)(addressing issue).  If it was later determined that the employee was acting outside the scope of his employment, he would be "re-substituted."  Id. As the issue stands, re-substitution is not appropriate for, as discussed in the text, Mr. Rivera was acting within the scope of his employment at the time of the incident out of which the tort claim arose.

[3] The Department of Agriculture established APHIS in 1972.  See, 37 Fed. Reg. 6327 (Assignment of Functions and Delegation of Authority).  APHIS is a multi-faceted agency, with a broad mission area that includes protecting and promoting U.S. agricultural health, regulating genetically engineered organisms, administering the Animal Welfare Act and carrying out wildlife damage management activities.  In turn, these efforts support the overall mission of the Department of Agriculture, which is to protect and promote food, agriculture, natural resources and related issues. See, "About APHIS" Section at www.aphis.usda.gov (last visited on October 26, 2020).

Case 3:16-cv-02461-PAD   Document 89   Filed 10/26/20   Page 3 of 21

Vizcarrondo-González v. U.S. Dept. of Agriculture, et al.
Civil No. 16-2461 (PAD)
Opinion and Order
Page 3

No. 82, p. 4, ¶¶ 3-1, 3-2).  Both of them had reported to work at the International Airport on that date (Docket No. 82, p. 4, ¶ 3-4; Transcript October 8, 2020 ["TR"], p. 43).[4]

Ms. Vizcarrondo was assigned to the X-Ray Machine in Terminal A (Docket No. 82, p. 4, ¶ 3-5; TR, pp. 12, 13, 46.  Her shift started at 0600 hours (TR, p. 12).  Mr. Rivera worked overtime from 0400 to 0600 hours at Checkpoint # 5 (Docket No. 82, p. 4, ¶ 6; TR, p. 60).  After the overtime assignment ended, he was listed to begin his regular work schedule (Docket No. 82, p. 4, ¶ 7; TR, p. 60).  At the conclusion of the overtime, Mr. Rivera took two bags of contraband to the X-Ray Machine in Terminal A of the Airport, to discard it in the designated trashcan (Docket No. 82, p. 5, ¶ 8; TR, pp. 13-14, 25).

Mr. Rivera dropped off the contraband in the designated waste basket, greeted two co-workers that were in the same area;[5] walked toward the chair Ms. Vizcarrondo was sitting on; snatched his jacket from the chair;[6] kept walking to a table in the front; grabbed a thermos; verified the daily guide log in order to ascertain where he had to report for his regular work schedule; and left for his next post (TR, pp. 14-15, 25, 26, 45-46, 48-49).[7]  As part of the terms and conditions

---

[4] District Judges have Court Reporters as part of their staff when presiding over the different proceedings held before them.  Among other responsibilities listed in 28 U.S.C. § 753, reporters are responsible for promptly transcribing, when requested, the original record of all proceedings held before the judge and prepare and file a certified transcript.  The transcript is available, following applicable rules and regulations, to parties who have arranged payment.  Additionally, it is available at the request of a judge, at no charge to the court.  District Judges have access to the rough drafts of the transcripts before a formal request is made by any interested party or the transcript is filed for the record in the court.

[5] There were three people working in that location, including Ms. Vizcarrondo (TR, p. 38).

[6] As for grabbing his jacket from chairs during work assignments, Mr. Rivera conceded that was what he normally did, and that it is possible he took his jacket out of the chair Ms. Vizcarrondo was sitting on (TR, pp. 102-103).  The court concludes that he did so.

[7] According to Ms. Vizcarrondo, Mr. Rivera approached her "like a madman, like someone who was crazy," and took the jacket without even saying, "[e]xcuse me, Ms. Vizcarrondo, this jacket is mine, can I take it" (TR, p. 15).  She expressed that Mr. Rivera grabbed the jacket "abruptly," "like a madman."  Id. at pp. 15, 20.  She indicated that she got very scared (id.) and was afraid.  Id. at 44. She said that she was not sitting on top of the jacket, albeit parts of her body – her lower back and part of her buttocks – were in contact with the jacket, and Mr. Rivera touched the bottom

of employment, APHIS allows its employees to use official government jackets as part of their uniform (Docket No. 82, p. 5, ¶ 3-10). Employees must keep all of their equipment and uniforms with them at all times in all stations they go to (TR, p. 51). The only place where Mr. Rivera could have discarded the contraband was the station Ms. Vizcarrondo was assigned to work on that day. Id. at pp. 25-26.

## III. DISCUSSION

### A. Scope of Employment

The FTCA waives the United States' sovereign immunity with respect to certain, but not all, types of tort actions. See, Limone v. United States, 579 F.3d 79, 88 (1st Cir. 2009)(discussing topic). Similarly, it immunizes federal employees for all liability for any negligent or wrongful acts or other common law tort claims committed while acting within the scope of their employment at the time of the incident out of which the tort claim arose. Id.

The Attorney General "can certify that a federal employee named as a defendant in a civil case was acting within the scope of his office or employment at the time of the incident that serves as the basis for a tort claim against the employee." Lyons v. Brown, 158 F.3d 605, 606 (1st Cir. 1998)(internal citations omitted). The Attorney General has delegated the authority to make scope of employment certifications to the United States Attorneys with respect to civil actions brought against federal employees in their respective districts. Id. at 607 n.1.

In this case, the United States Attorney for the District of Puerto Rico certified that Mr. Rivera was acting within the scope of his employment (Docket No. 65). That certification was "conclusive unless challenged." Gutiérrez de Martínez v. Drug Enforcement Administration, 111

_____

part of her back where her buttocks began. Id. at 20. She stated that Mr. Rivera did not direct any words to her on that day. Id. at 43-44.

F.3d 1148, 1153 (4th Cir. 1997). As mentioned earlier, it was challenged. When the certification is challenged, it serves as *prima facie* evidence and shifts to the plaintiff the burden to show, by a preponderance of the evidence, that the defendant federal employee was acting outside the scope of his employment. Id. In assessing whether the plaintiff has rebutted the *prima facie* case, the district court does not defer to the Attorney General's certification, but instead reviews the question *de novo*. Id. at 1154. In this manner, it must "determine independently" whether the employee was acting within the scope of his federal employment when the allegedly wrongful act occurred. Anthony v. Runyon, 76 F.3d 210, 214 (8th Cir. 1996).[8]

Whether or not a particular act is within the scope of employment "is a matter to be determined in accordance with the law of the place" in which the tortious act allegedly occurred. Borrego v. United States, 790 F.2d 5, 6 (1st Cir. 1986). In this case, that place is Puerto Rico. As elsewhere, the scope-of-employment issue in Puerto Rico is normally resolved not to give immunity to the employee, but to impose liability on the employer under the *respondeat superior* doctrine. Id. at 7. All the same, the inquiry focuses on whether: (1) the employee's acts furthered a desire to serve and benefit his employer's interest; (2) the act is reasonably related to the scope of the employee's employment; and (3) the employee has acted out of purely personal motives. Id.

Mr. Rivera was serving the interests of his employer when he was amid shifts, moving between work areas in the Luis Muñoz Marín International Airport, in order to discard contraband, review a daily guide log to find out the post to which he had to report to next, and take his official

---

[8] See also, Nasuti v. Scannell, 906 F.2d 802, 813 (1st Cir. 1990)(for substitution purposes, the scope-of-employment issue must be "independently resolved by the court"). Parenthetically, Osborn v. Haley, 549 U.S. 225, 237, 243 (2007) abrogated Nasuti on the issue of remand following rejection of certification, but not as to the propositions for which the case is being referred to in this Opinion and Order.

jacket with him.  These actions took place in the workplace, during working hours, were directly related to Mr. Rivera's employment as PPQT for APHIS, and advanced the employer's interests, for the agency's mission is furthered when its employees report to work on time (TR, pp. 26, 85, 86), review the daily log to make sure they know where they are assigned to work (id. at pp. 87), discard contraband in the assigned containers (id. at pp. 27, 86), and are appropriately dressed and duly uniformed in the workplace.  Id.[9]  Furtherance of the mission results in a direct benefit to taxpayers and in protection of the public interest.

Ms. Vizcarrondo argues that Mr. Rivera was driven by purely personal motives and "had it against" her because at one point he was suspended from work after she complained against him (TR, p. 97).[10]  A "partially selfish motivation does not, by itself, render an employee's conduct outside the scope of employment."  Villeza v. United States, 2006 WL 278618, *3 (D.Haw. Jan. 5, 2006).  Animosity or ill will for a plaintiff, standing alone, is insufficient to deny substitution. See, Maron v. United States, 126 F.3d 317, 325 (4th Cir. 1997)(applying formulation).  Those sentiments must be looked at "in context, rather than in a vacuum."  Id.  They will not take the

---

[9] *Compare with* Merlonghi v. United States, 620 F.3d 50, 56-57 (1st Cir. 2010)(federal employee was not acting within scope of his employment, for even though he was on call and driving a government vehicle at the time of a traffic accident, he was not traveling to a work assignment, had engaged plaintiff in a car chase swerving back and forth in a taunting match, pursuing a personal argument in the vehicle with gun in hand); White v. Hardy, 678 F.2d 485, 486-487 (4th Cir. 1982)(plaintiff was injured while riding as a passenger in a taxicab, which collided with a U.S. Army truck driven by an army sergeant, but the sergeant was not acting within scope of his employment, as he was not engaged in the business of his employer at the time of the injury: he had not been authorized to use the government vehicle involved in the collision, he used the vehicle to make a personal phone call outside the command post, the call was neither part of his official duties nor incident to the duties entrusted to him by the government, and the sergeant stayed out of the post for several hours prior to the collision); Meléndez-Colón v. United States, 56 F.Supp.2d 147 (D.P.R. 1999)(ship captain was not acting within scope of his employment at the time of a fatal traffic accident, as even though he was driving a Navy vehicle, the accident occurred after the captain had drinks in two bars upon leaving military base in the vehicle).

[10] On the same point of alleged personal motives for Mr. Rivera's action, see, Docket No. 66, "Plaintiff's Opposition to Defendant USDA's Certification and Request for Judicial Abrogation of the USDA's Certificate of Scope of Employment (Docket Nos. 65, 65-1)", p. 8; TR, p. 127.

<u>Vizcarrondo-González</u> v. <u>U.S. Dept. of Agriculture, *et al.*</u>
Civil No. 16-2461 (PAD)
Opinion and Order
Page 7

conduct outside the employee's scope of employment unless there is no link between the employee's act and the employer's legitimate interest. See, <u>Attallah</u> v. <u>United States</u>, 955 F.2d 776, 781-782 (1st Cir. 1992)("…[T]here must be some link between the intentional … act committed by the employee, and the legitimate interests of the employer").

On that understanding, the record shows a direct link connecting Mr. Rivera's acts with APHIS's interest. *Compare* <u>McIntyre ex rel.</u> v. <u>United States</u>, 545 F.3d 27, 29-30, 39-40 (1st Cir. 2008)(FBI agent was acting within the scope of his employment when he leaked the identity of an informant to two other informants, both of whom were considered particularly valuable sources of information for the FBI's investigation of the Boston branch of La Cosa Nostra, and notwithstanding the fact that the leak resulted in the brutal murder of the first informant by the other two informants and their associates; albeit the agent was partially motivated by greed and the desire to maintain his friendship with the murderer-informants, who had given him in excess of $200,000 over a number of years, he was motivated, at least in part, by a desire to promote the FBI's goal of taking down La Cosa Nostra through the use of the murderers as informants), *with* <u>Attallah</u>, 955 F.2d at 781-782 (two Customs agents who assaulted, robbed and then murdered a courier were not acting for the benefit of the Customs Service; there was no obvious way in which their motivations would overlap with those of the Customs Service). The employee's notion of how to serve his employer's interests need not be "reflective of good judgment." <u>Aversa</u> v. <u>United States</u>, 99 F.3d 1200, 1212 (1st Cir. 1996)(scope of employment found even though a federal prosecutor allegedly defamed plaintiff for the purpose of promoting his own career with some self-serving statements, as he partly intended, albeit misguidedly, to serve the employer's interest).

Ms. Vizcarrondo contends that Mr. Rivera's acts were not reasonably related to the scope of his employment, for nothing in his job description can be viewed as having performed a job

Vizcarrondo-González v. U.S. Dept. of Agriculture, et al.
Civil No. 16-2461 (PAD)
Opinion and Order
Page 8

function by committing assault or battery on her (Docket No. 66, pp. 7-8; TR, p. 128).  That is not

the test.  As pointed out in Maron, 126 F.3d at 325:

> Few government authorities are authorized to commit torts as part
> of their line of duty, but to separate the activity that constitutes the
> wrong from its surrounding context – an otherwise proper exercise
> of authority – would effectively emasculate the immunity defense.
> Once the wrongful acts are excluded from an exercise of authority,
> only innocuous activity remains to which immunity would be
> available.  Thus the defense would apply only to conduct for which
> it is not needed (internal citations omitted).

For the same reason, that a tort is not described in a job description is not dispositive of whether

an employee was acting within the scope of employment when she is alleged to have engaged in

the conduct at issue.  See, Caesar v. United States, 258 F.Supp.2d 1, 4 (D.D.C. 2003)(employee

alleged to have slammed her office door into coworker using her full body weight following verbal

exchange about a project both employees were working on was acting within the scope of her

employment; the fact that her job description did not include slamming doors into people does not

dispose of issue of whether she was acting within the scope of her employment when she is alleged

to have done so).  All things considered, Mr. Rivera was acting within the scope of his employment

at the time of the incident upon which the tort claim is based.  Therefore, substitution by the United

States follows as a matter of law.

### B.  Effect of Substitution

The FTCA states that once the United States has been substituted as the party defendant,

the action "shall be subject to the limitations and exceptions applicable to … any action against

the United States filed pursuant to section 1346(b)."  28 U.S.C. § 2679(d)(4).[11]  This is so even

---

[11] Section 1346(b) states in part that "district courts … shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government

where "an exception to the FTCA precludes government liability." Aversa, 99 F.3d at 1207-1208. Two impediments bar further pursuit of Ms. Vizcarrondo's tort claim: scope of the immunity waiver and lack of exhaustion.

### a. Scope of Immunity Waiver

Ms. Vizcarrondo asserts that Mr. Rivera physically assaulted her in snatching his jacket from the chair she sat on, and committed battery.[12]  With respect to Criminal and Tort Law, the term "assault" has been defined as "[t]he threat or use of force on another that causes that person to have a reasonable apprehension of imminent harmful or offense contact."  Black's Law Dictionary 137 (10th ed. 2009).  In relation to Tort Law, the term "battery" has been defined as "[a] nonconsensual, intentional, and offensive touching of another without lawful justification, but not necessarily with the intent to do harm or offense as required in criminal battery." Id. at 182.[13] The interest protected by the attachment of liability to a non-consensual touching extends "to any part of the body, or to anything which is attached to it and practically identified with it."  Id.  So, "if all other requisites of a battery against the plaintiff are satisfied, contact with the plaintiff's

---

while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

[12] In the Complaint, Ms. Vizcarrondo alleges that in snatching his jacket from the chair she was sitting on, Mr. Rivera physically assaulted her by brushing his hand over her back and buttocks.  See, Docket No. 1, ¶ 59.  She repeats the allegation in opposing summary judgment.  See, Docket No. 44, p. 5. In the sur-reply to the Government's reply to her opposition to summary judgment, she refers to the incident as one of sexual assault.  See, Docket No. 56, p. 6.  In her opposition to the scope of employment certification, she states that by snatching his jacket from the chair, Mr. Rivera physically assaulted or committed battery against her, and later in the same document, characterizes Mr. Rivera's action as assault and battery.  See, Docket No. 66, p. 7.  In her motion for scheduling of an evidentiary hearing, she describes the incident both as a physical assault – Docket No. 69, pp. 2, 7 – and as physical assault and battery.  Id. at p. 7.  In the pre-hearing joint informative motion, she states that on January 14, 2016, Mr. Rivera snatched his jacket from a chair she was sitting on and in so doing, physically assaulted her.  See, Docket No. 82, pp. 1-2.  Arguing the scope of employment issue during the hearing, her counsel said that Mr. Rivera committed an assault and battery (TR, pp. 110, 112).  For present purposes, the court relies on that characterization as plaintiff's understanding of her tort claim.

[13] In this fashion, battery stands in contrast with "assault," given that this term refers to the "apprehension of imminent contact rather than contact itself."  Prosser and Keeton, *The Law of Torts* (5th Ed. 1984), p. 39.

Vizcarrondo-González v. U.S. Dept. of Agriculture, et al.
Civil No. 16-2461 (PAD)
Opinion and Order
Page 10

clothing, or with a cane, a paper, or any other object held in the plaintiff's hand may be sufficient;

and the same is true of the chair in which plaintiff sits, the horse or the car the plaintiff rides or

occupies, or the person against whom the plaintiff is leaning…." for "[t]he interest in the integrity

of the person includes all those things which are in contact or connected with the person."  Id. at

39-40.  These intentional torts are recognized in Puerto Rico.  See, 1 Herminio Brau del Toro, Los

Daños y Perjuicios Extracontractuales en Puerto Rico (2d Ed. 1986), 82-91 (discussing topic).[14]

The description of the event that Ms. Vizcarrondo rendered during the hearing – referred to in note

7 – fits these categories.[15]

　　　　The FTCA immunizes the United States for liability for most intentional torts, including

those "arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse

of process, libel, slander, misrepresentation, deceit, or interference with contractual rights,"

provided that with regard to acts or omissions of investigative or law enforcement officers of the

_____

[14] Brau del Toro has been cited with approval in the First Circuit and this court.  See, Irvine v. Murad Skin Research Laboratories, Inc., 194 F.3d 313, 322 (1st Cir. 1999); Woods-Leber v. Hyatt Hotels of Puerto Rico, Inc., 951 F.Supp.1028, 1036 (D.P.R. 1996).

[15] This description does not, however, match the accounts that Ms. Vizcarrondo provided to APHIS around the time of the event.  For instance, contrary to what she testified during the hearing, in her first written account, she reported that Mr. Rivera pulled a black jacket that was laid in the chair that she was seated on "[b]rushing her buttocks, [] low back and back" (Docket No. 63, p. 12)  She emailed this account to Ms. Eunice Everett, who referred the matter to supervisor José Jiménez.  Id.  After being informed of the incident, Mr. Jiménez followed up with Ms. Vizcarrondo, seeking clarification about her statement that Rivera "brush[ed] [her] buttocks, low back, and back."  Id.  In response, she sent to Mr. Jiménez a revised statement stating that the jacket, rather than Mr. Rivera himself, brushed her buttocks, lower back, and back.  Id.  At no time did Ms. Vizcarrondo mention in those accounts that Mr. Rivera approached her like a madman, like someone who was crazy, that he took the jacket like a madman, or that she was afraid and very scared.  Compare Ms. Vizcarrondo's testimony during hearing (TR, pp. 15, 20, 43, 44), with her written accounts of the same incident included as Government Exhibit D, p. 3 (first written account) and p. 7 (revised account).  In any event, the court stands by its analysis and conclusion regarding the character of the event and of APHIS' response for purposes of Title VII, and why they do not lead to liability here.  See, Docket No. 63, p. 40 (explaining why, as clarified, Mr. Rivera's act was objectively mild) and pp. 35, 36 (analyzing the appropriateness of employer's response in light of the employee's clarification, on which the employer was entitled to rely).  Thus, unwanted touching may lead to tort liability – Cohen v. Davis, 926 F.Supp. 399, 401-402 (S.D.N.Y. 1996)(grabbing plaintiff's arm to prevent her from leaving a room may sustain action for assault and battery); Harper v. Winston County, 892 So. 2d 346, 353-354 (Ala. 2004)(similar) – but not necessarily to liability under Title VII.  See, Opinion and Order (Docket No. 63, at pp. 35, 36, 40)(addressing issue under Title VII).

United States Government, liability may be imposed upon the United States as to "any claim arising … out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution."  28 U.S.C. § 2680(h).

For purposes of this provision – known as the "law enforcement proviso," Millbook v. United States, 569 U.S. 50, 52-53 (2013) – "investigative or law enforcement officer" means any officer of the United States who is empowered by law "to execute searches, to seize evidence, or to make arrests for violations of Federal law."  Id.  The proviso thus distinguishes between the acts for which immunity is waived (*e.g.* assault and battery), and the class of persons whose acts may give rise to an actionable FTCA claim.  Id. at 56.  For that reason, immunity determinations depend on a federal officer's legal authority, not on a particular exercise of that authority.  Id.

The parties did not refer the court to caselaw on the subject of whether PPQT's engaged in airport preboarding screening activities fall within the law enforcement proviso, and the court found none.  But it located a decision addressing the issue in connection with other APHIS employees.  See, Lorsch v. United States, 2015 WL 6673464, *11 (C.D. Cal. October 29, 2015) (noting that regulations and job descriptions indicated that APHIS officials assigned to the Animal Care Program were not officers within the purview of the law enforcement proviso).  The court will follow the same analytical approach here.

Starting with the Job Description ("JD"), PPQTs conduct inspections of means of conveyance, cargo, passengers, pedestrians, baggage, interdiction activities, screening packages in mail facilities, and miscellaneous articles (Docket No. 66-1, p. 1).  Also, they carry out routine inspection of vessels and aircraft for restricted or prohibited agricultural commodities, by-products, contaminates and pests that are potentially dangerous to the nation's agriculture.  Id.  In executing their duties, they assist professional staff in inspecting regulated cargo and inspect low

risk cargo under the supervision of a higher graded employee.  They report suspected infested materials to a PPQO for final determination.  Id.  Prohibited material is seized and disposed of in accordance with established procedures.  Id.  They seal and safeguard prohibited, restricted, or infested commodities as directed by officers.  Id.

In turn, the Technician Utilization Guidelines delineate technician and officer duties and responsibilities (Docket No. 68-1).  In connection with pre-departure passenger, baggage, and air cargo inspections, it states that the following duties, among others, may be assigned to PPQTs: direct passengers to place bags on x-ray belt; operate x-ray machine; including viewing x-ray screen; open and examine contents of baggage; perform survey inspections; check outgoing baggage for APHIS stickers; place APHIS stickers on bags after release; assist supervisor with inspections and in examining seized contraband for pests; transport seized contraband to the lab; input data into computer systems; and maintain quarantine material interception data.  Id. at p. 8. On the subject of confiscations, the Guidelines state that only officers – not PPQT's – may confiscate and destroy prohibited foreign products that enter Hawaii and Puerto Rico.  Id.[16]  Mr. Rivera worked in the predeparture area, side-by-side with an officer (TR, p. 69).

All of these activities take place within the framework of a regulatory setting.  Pursuant to 7 C.F.R. § 318.13-10, passengers destined for movement by aircraft from Hawaii, Puerto Rico, Guam, the Commonwealth of the Northern Mariana Islands or the U.S. Virgin Islands to any other State, shall offer their carry-on baggage and other personal effects for inspection at the place marked for agricultural inspections, which will be located at the airport security checkpoint or the

---

[16] The Guidelines do not otherwise express that officers may seize or confiscate material bound for the United States from Puerto Rico, albeit in stating that technicians may assist supervisors with inspections and in examining seized contraband, they imply that they are authorized to do so.

aircraft boarding gate, at the time they pass through the checkpoint or the gate.  Further, they shall

offer their check-in baggage for inspection at agricultural inspection stations prior to submitting

their baggage to the check-in baggage facility.  When an inspector has inspected and passed such

baggage or personal effects, he or she shall apply a U.S. Department of Agriculture stamp,

inspection sticker, or other identification to such baggage or personal effects to indicate that such

baggage or personal effects have been inspected and passed as required.  Id.

In line with Section 318.13-10, passengers shall disclose any fruits, vegetables, plants,

plant products, or other articles that are requested to be disclosed by the inspector.  When an

inspection of a passenger's baggage or personal effects discloses an article in violation of this part,

the inspector shall seize the article.  Id.  In that case, the passenger shall state his or her name and

address to the inspector, and provide the inspector with corroborative identification.  Id.  The

inspector shall record the name and address of the passenger, the nature of the identification

presented for corroboration, the nature of the violation, the types of articles involved, and the date,

time, and place of the violation.  Id.  In this situation, APHIS looks for items that pose a threat to

native plant health, which are prohibited but not illegal to possess.

In contrast, investigative activities within APHIS are conducted by APHIS' Investigative

and Enforcement Services ("IES"), which provides investigative, enforcement, and regulatory

support services to four APHIS programs: Animal Care, Biotechnology Regulatory Services, Plant

Protection Quarantine, and Veterinary Services.  See, "Investigative and Enforcement Services

(IES)," at  https://www.aphis.usda.gov/aphis/resources/sa_enforcement_actions.  Likewise, it

supplies these services for agricultural quarantine inspection activities carried out by the

Department of Homeland Security's Custom and Border Protection.  Id.  Its work is divided

between two groups.  Id.  Field investigators conduct investigations and produce reports of

investigation, and headquarters enforcement staff members review completed reports of investigation for evidentiary sufficiency.  Id.  Once the information and evidence gathered during an investigation supports a finding of a violation, APHIS may pursue enforcement action against that person or entity.  Id.

In this way, when APHIS personnel discover a potential violation of an APHIS-administered law, they may request a formal investigation by IES.  See, "Investigative and Enforcement Process," at https://www.aphis.usda.gov/aphis/ourfocus/business-services/ies/ies processes  The investigation is considered a fact-finding mission, which may include collecting documents, taking photographs, and interviewing witnesses including the alleged violator.  Id. When an alleged violator is interviewed as part of the investigative process, IES provides the alleged violator with the opportunity to submit any evidence that may demonstrate they did not violate an APHIS-administered law.  Id.  Once the investigation is complete, the investigator prepares a report of investigation, which summarizes the investigative findings.  Id.  The investigator sends the report of investigation and all evidence collected to IES' enforcement for review.  Id.

After the enforcement staff receives the report of investigation and accompanying evidence a specialist reviews and analyzes this information to determine if the violation is substantiated by the evidence provided.  See, "Investigative and Enforcement Process," supra.  If the evidence shows that a violation has occurred, the enforcement staff determines whether an enforcement action is appropriate.  Id.  In preparing penalty recommendations, IES relies on the penalty provisions contained in the relevant APHIS-administered law.  Id.

As each statute contains a unique provision, IES applies penalty adjustments for aggravating and mitigating factors, and consults with the referring program before carrying out

any enforcement action.  See, "Investigative and Enforcement Process," supra.  Enforcement actions may include an official warning, a voluntary settlement agreement, a referral to the Department of Agriculture's Office of the General Counsel to institute an administrative proceedings, or, in cases involving the most serious violations, a referral to the Department of Justice for civil or criminal action.  Id.  Mr. Rivera was not assigned to the IES.

At another level, arrest, search and seizure, and firearm authorities within the Department of Agriculture are vested on the Office of the Inspector General.  See, 7 C.F.R. Part 1a, § 1a.2 (Secretary of Agriculture, Law Enforcement Authorities).  To this end, officials in the Office of the Inspector General who conduct investigations of alleged or suspected felony criminal violations of statutes administered by the Secretary of Agriculture or any agency of the Department of Agriculture, may be designated by the Inspector General: (a) to make arrests without a warrant for any criminal felony violation of those statutes, if such violation is committed, or if the official has probable cause to believe that such violation is being committed in his presence; (b) execute and serve a warrant for an arrest, for the search of premises, or the seizure of evidence if such warrant is issued under the authority of the United States upon probable cause to believe that any criminal violation of the statutes referred to earlier has been committed; and (c) carry a firearm. Id. at § 1a.2.

Officials who receive the designation qualify as law enforcement officers under Section 2680h.  See, Gesty v. United States, 400 F.Supp.3d 859, 864-865 (D.Ariz. 2019)(noting that TSA Administrator is authorized to designate employees to be law enforcement officers, which gives them the authority to make arrests, seek and execute warrants, and carry firearms, and when he does so, those employees are investigative or law enforcement officers within the meaning of the law enforcement proviso).  Mr. Rivera, however, was not an official in the Office of the Inspector

Vizcarrondo-González v. U.S. Dept. of Agriculture, *et al.*
Civil No. 16-2461 (PAD)
Opinion and Order
Page 16

General who would qualify to be designated by the Inspector General to exercise law enforcement authority.[17]

With this in mind, it is apparent that Mr. Rivera was not an investigative or law enforcement officer within the APHIS organization.  To test coverage or absence of coverage under the law enforcement proviso, however, an analogous context is helpful: TSA airport screeners-Transportation Security Officers or "TSOs."  Most courts that have addressed the issue have concluded that TSO's "do not fall" within the scope of the proviso.  Scruggs v. Nielsen, 2019 WL 1382159, *3 (N.D.Ill. March 27, 2019)(collecting cases).  Yet "most" does not mean "all," and two contrasting views have emerged to look over this issue.  See, Iverson v. United States, 973 F.3d 843, 854-855 (8th Cir. 2020)(finding that TSO's are investigative or law enforcement officers); Pellegrino v. United States of America Transportation Security Administration, 937 F.3d 164, 180 (3d Cir. 2019)(en banc)(same); Corbett v. Trans. Sec. Admin., 568 F.Appx. 690, 701 (11th Cir. June 4, 2014)(per curiam)(finding that TSOs are not investigative or law enforcement officers).[18]

---

[17] To illustrate a potential focus of investigation, the Plant Protection Act, 7 U.S.C. § 7701-7786 ("PPA"), bestows upon the Secretary of Agriculture and other Federal agencies the authority to regulate exports, imports, and interstate commerce in agricultural products and other commodities that pose a risk of harboring plant pests or noxious weeds as one way to reduce risk of dissemination of plant pests or noxious weeds.  See, 7 U.S.C. § 7701(2), (3).  The PPA allows the Secretary to "gather and compile information and conduct any investigations … necessary for the administration and enforcement of this chapter."  7 U.S.C. § 7732.  To that end, the Secretary has the power to subpoena the production of evidence, or to require a person to whom the subpoena is directed to permit the inspection of premises relating to any matter under investigation.  7 U.S.C. § 7733.  Persons required to submit to inspection may disobey the subpoena.  In case of disobedience, the Secretary may request the Attorney General to invoke the aid of any court of the United States within the jurisdiction in which the investigation is conducted or whether the person resides, is found, transacts business, is licensed to do business, or is incorporated, in requiring the attendance and testimony of any witness, the production of evidence, or the inspection of premises.  7 U.S.C. § 7733(c).  Alternatively, the Secretary may "enter with a warrant, any premises … for the purpose of conducting investigations or making inspections and seizures under this chapter."  7 U.S.C. § 7731(c)(1).  As PPQT, Mr. Rivera was not assigned to any such investigations.

[18] Highlighting differences, both Iverson and Pellegrino generated dissenting opinions.  See, Iverson, 973 F.3d at 855 (Judge Gruender, Circuit Judge, dissenting); Pellegrino, 937 F.3d at 181 (Krause, Circuit Judge, dissenting, joined by Jordan, Hardiman, and Scirica, Circuit Judges).

TSOs carry out the TSA's duty "to screen" all passengers and property to be carried onboard passenger aircrafts.  Scruggs, 2019 WL 1382159 at *3.[19]  Screenings can include "various electronic means, canine detection teams, and a physical search with manifest verification."  Iverson, 973 F.3d at 851.  While screening, TSOs "look into or over" passengers and their property "carefully … in an effort to find or discover" "contraband or illicit … property."  Iverson, 973 F.3d at 851.  They use millimeter wave advanced imaging technology, which safely screens passengers … for metallic and non-metallic threats, including weapons and explosives, which may be concealed underclothing."  Id.  They may conduct "[p]at-down procedures, which include inspections of the head, neck, arms, torso, legs and feet, and inspect "sensitive areas such as breasts, groin, and the buttocks," using "sufficient pressure to ensure detection."  Pellegrino 937 F.3d at 173-174.

When a flight originates in the United States, the screening "shall take place before boarding."  49 U.S.C. § 44901.  TSOs "do not … seize materials that violate Federal laws, but rather collect items that are prohibited in carry-on luggage."  Gesty, 400 F.Supp.3d at 864.  Although they are tasked with identifying evidence, it is ultimately a law enforcement officer "who is summoned to take action."  Leuthauser v. United States, 2020 WL 4677296, *3 (D.Nevada August 12, 2020).  When the TSO finds evidence of prohibited items (as opposed to illegal contraband) "the screener gives the passenger the option of disposing of the item, leaving the item with someone, taking the item back to their vehicle, or abandoning the item."  Id.

---

[19] Correspondingly, individuals must submit to screening and inspection of their person and property.  See, 49 C.F.R. § 1540.107 (so requiring).  Airlines "must refuse to transport … [a]ny individual who does not consent to a search or inspection of his or her person" and [a]ny property of any individual or other person who does not consent to a search or inspection of that property."  49 C.F.R. § 1544.201(c).

Vizcarrondo-González v. U.S. Dept. of Agriculture, et al.
Civil No. 16-2461 (PAD)
Opinion and Order
Page 18

From these elements, courts excluding TSOs from the law enforcement proviso reason that properly read, the proviso "connote[s] traditional law enforcement officer responsibilities." Leuthauser, 2020 WL 4677296 at *3.  They note that TSO's "perform limited consensual searches that are administrative in nature."  Weinraub v. United States, 927 F.Supp.2d 258, 262 (E.D.N.C. 2012).  So, they find it unreasonable to interpret the term "to execute searches" to include TSOs performance of narrowly focused, consensual administrative searches, when considered in light of the other traditional law enforcement functions of arrest and seizure of evidence.  Id. at 263.[20]

By comparison, the Third Circuit held that TSOs fall under the law enforcement proviso because they execute searches.  See, Pellegrino 937 F.3d at 177.  In this regard, it observed that TSA screenings "are more personal than traditional administrative inspections …[for] they extend to the general public and involve examinations, often intrusive, of an individual's physical person along with her property."  In a similar vein, the Eighth Circuit found that TSO's fall into the proviso taking note "of the powers delegated to [them] and the highly intrusive search techniques they are authorized to use."  Iverson, 973 F.3d at 854.

Neither perspective places Mr. Rivera within the ambit of the law enforcement proviso.  As a PPQT, he performed narrowly focused screening tasks, set on an administrative, not a law enforcement objective.  He did not have investigative or arrest powers.  Contrary to TSOs, the preboarding screenings he was authorized to conduct were limited to baggage and personal effects,

---

[20] See also, Leuthauser, 2020 WL 4077296 at *3 ("When reading the proviso in its entirety, 'execute searches,' 'seize evidence,' and 'make arrests' connote traditional law enforcement officer responsibilities, as opposed to the administrative screenings performed by TSA screeners").

not potentially intrusive bodily interventions.  Seizure authority lay in the officer, not the PPQT.  In consequence, the law enforcement proviso does not apply here.[21]

The FTCA is the "exclusive remedy for torts committed by federal employees acting within the scope of their employment."  Brown v. Armstrong, 949 F.2d 1007, 1013 (8th Cir. 1991).  If recovery is not available against the United States, it is not available at all.  Id.[22]  Hence, Ms. Vizcarrondo's tort claim cannot survive.  See, Wilson v. Drake, 87 F.3d 1073, 1076 (9th Cir. 1996)(dismissing tort claim based on assault, battery, and false imprisonment, in part because they occurred within scope of tortfeasor's federal employment and the United States may not be found liable for those intentional torts); Wilson v. United States, 959 F.2d 12, 14-16 (2d Cir. 1992)(dismissing intentional tort claims against the United States because plaintiff complained of false imprisonment, abuse of process, and malicious prosecution committed by parole officers, those officers were outside the scope of law enforcement proviso, and federal government has not waived its immunity as to the torts attributed to the officers).

### b.  Exhaustion

As mentioned earlier, Ms. Vizcarrondo faces another hurdle: failure to exhaust.  Unlike a suit against a private person, to pursue an FTCA claim "the Congress has created an administrative procedure that claimants must follow and exhaust."  Santiago-Ramírez v. Secretary of Dept. of Defense, 984 F.2d 16, 18 (1st Cir. 1993).  To this end, the FTCA provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate

---

[21] Ms. Vizcarrondo conceded that Mr. Rivera was not a law enforcement officer (TR, pp. 113-114).

[22] See also, Dávila v. Gutierrez, 330 F.Supp.3d 925, 937 (S.D.N.Y. 2018)("Even if an action against the federal government is the only possible remedy a plaintiff may have for torts by federal employees, the action cannot be brought if the United States has not explicitly waived sovereign immunity for such claims").

Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented." 28 U.S.C. § 2401(b).  Likewise, it states that "[a]n action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."  28 U.S.C. § 2675(a).[23]

Despite these requirements, Ms. Vizcarrondo did not institute any such claim.  See, Declaration of Elizabeth J. Groth, Legal Administrative Specialist with APHIS (Docket No. 68, Exh. 2)(explaining that an electronic search of all USDA-APHIS nationwide records of administrative tort claims show no evidence of an administrative claim filed by or on behalf of Ms. Vizcarrondo).  Furthermore, a plaintiff has the burden to "both plead and prove compliance" with the statutory exhaustion requirements.  In re Agent Orange Prod. Liab. Litg., 818 F.2d 210, 214 (2d Cir. 1987), *cert. denied,* 484 U.S. 1004 (1988).  That, Ms. Vizcarrondo did not do.  Nor did she attempt to justify her failure to exhaust.  See, Dávila, 330 F.Supp.3d at 936-937 (dismissing tort claim because plaintiff did not first present his claim to the appropriate agency and exhaust administrative remedies); Villeza, 2006 WL 278618 at *5 (similar).

Ms. Vizcarrondo contends that the assault and the battery infringed her dignity and add up to an actionable tort under Puerto Rico's Constitution not subject to the FTCA (Docket No. 66, p.

---

[23] The FTCA's bar for presentment is a "claims-processing rule."  Ortiz-Rivera v. United States, 891 F.3d 20, 24 (1st Cir. 2018)(citing United States v .Wong, 135 S. Ct. 1625(2015)).

Vizcarrondo-González v. U.S. Dept. of Agriculture, *et al.*
Civil No. 16-2461 (PAD)
Opinion and Order
Page 21

11).  Not so.  Claims for violations to the dignity protection provision of the Constitution of Puerto Rico "translate into suits amenable to FTCA liability."  Rosario v. United States, 538 F.Supp.2d 480, 493 (D.P.R. 2008).  They cannot be brought against federal employees acting within the scope of their employment and may only be asserted against the United States under the FTCA.  Id.[24] And for the reasons mentioned earlier, the assault-battery claim does not withstand dismissal.

## IV. CONCLUSION

In view of the foregoing, the United States substitutes Mr. Rivera as the defendant in connection with the intentional tort claim in line with 28 U.S.C. § 2679(d), and in turn, that claim is DISMISSED pursuant to 28 U.S.C. §§ 2401(b), 2675(a), and 2680(h).  Judgment shall be entered accordingly.

**SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of October, 2020.

s/Pedro A. Delgado Hernández
PEDRO A. DELGADO HERNÁNDEZ
United States District Judge

---

[24] See also, Papa v. United States, 281 F.3d 1004, 1010 n.20, 1011 (9th Cir. 2002)(treating claim against the United States for violations of California Constitution as FTCA claim)(superseded as to forum state's role in determining statute of limitations for Bivens claim).